DECISION AND JOURNAL ENTRY
This cause was heard upon the record in the trial court. Each error assigned has been reviewed and the following disposition is made:
{¶ 1} Defendant-Appellant Mark Alston has appealed from his convictions in the Lorain County Court of Common Pleas. This Court affirms.
 I {¶ 2} On May 12, 2005, Defendant-Appellant Mark Alston was indicted for aggravated robbery, in violation of R.C.2911.01(A)(1)/2911.01(A)(3), with a firearm specification. Appellant waived reading of the indictment and entered not guilty pleas to the charge and specification. On May 26, 2005, a supplemental indictment was filed and Appellant was charged with murder, in violation of R.C. 2903.02(B); having weapons under disability, in violation of R.C. 2923.13(A)(2)/2923.13(A)(3); tampering with evidence, in violation of R.C. 2921.12(A)(1); and felonious assault, in violation of R.C.2903.11(A)(1)/2903.11(A)(2). All four counts in the supplemental indictment included firearm specifications. Appellant entered not guilty pleas to all charges in the supplemental indictment, including the firearm specifications.
 {¶ 3} On June 15, 2005, Appellant filed a pro se motion to sever his trial from that of his co-defendant Larry Moore. On June 17, 2005, the State filed a motion to consolidate Appellant's case with that of Larry Moore. On June 24, 2005, the trial court denied Appellant's motion for separate trials and granted the State's motion to consolidate.
 {¶ 4} A jury trial commenced on June 27, 2005. On June 30, 2005, the jury returned its verdict and found Appellant guilty of all five charges and their corresponding firearm specifications.[1] Appellant was subsequently sentenced to an aggregate term of 24 years to life incarceration.
 {¶ 5} Appellant has appealed his convictions, asserting two assignments of error. For ease of discussion, we first discuss Appellant's second assignment of error.
 II Assignment of Error Number Two
"THE CONVICTION OF MARK ALSTON WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 {¶ 6} In his second assignment of error, Appellant has argued that his conviction was against the manifest weight of the evidence. Specifically, he has argued that the evidence failed to show a robbery, a conspiracy to commit robbery, or that Appellant knew that co-defendant Larry Moore had a gun.[2] We disagree.
 {¶ 7} In reviewing whether a conviction is against the manifest weight of the evidence, this Court must:
"[R]eview the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986), 33 Ohio App.3d 339,340.
 {¶ 8} Weight of the evidence concerns the tendency of a greater amount of credible evidence to support one side of the issue more than the other. State v. Thompkins (1997),78 Ohio St.3d 380, 387. Further, when reversing a conviction on the basis that it was against the manifest weight of the evidence, an appellate court sits as a "thirteenth juror," and disagrees with the factfinder's resolution of the conflicting testimony. Id. An appellate court must make every reasonable presumption in favor of the judgment and findings of fact of the trial court. Karchesv. Cincinnati (1988), 38 Ohio St.3d 12, 19. Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." State v. Martin (1983),20 Ohio App.3d 172, 175; see, also, Otten,33 Ohio App.3d at 340.
 {¶ 9} Appellant's convictions at issue are aggravated robbery, felony murder, and felonious assault.[3] Pursuant to R.C. 2911.01:
"(A) No person, in attempting or committing a theft offense, * * * or in fleeing immediately after the attempt or offense, shall do any of the following:
"(1) Have a deadly weapon on or about the offender's person or under the offender's control and either display the weapon, brandish it, indicate that the offender possesses it, or use it;
"* * *
"(3) Inflict, or attempt to inflict, serious physical harm to another." Appellant's felony murder conviction was based on R.C.2903.02(B), which states "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]" Appellant was also convicted of felonious assault. Pursuant to R.C. 2903.11, "(A) No person shall knowingly do either of the following: (1) Cause serious physical harm to another[;] (2) Cause or attempt to cause physical harm to another * * * by means of a deadly weapon or dangerous ordnance."
 {¶ 10} During the trial, the victim's[4] girlfriend, Marla Renee Taylor ("Girlfriend"), testified to the following. Girlfriend had known Appellant and his co-defendant Larry Moore ("Jo-Jo") for about ten years. In the early morning hours of May 3, 2005, Girlfriend went to the victim's house; she arrived about 1:15 a.m. The two started watching a basketball game in the living room and she fell asleep. The victim woke Girlfriend up and she went to sleep in a bedroom with the victim. Girlfriend continued her testimony and testified that at some point during the night, she felt the victim get out of bed. She then heard the victim say in a scared tone, "wait a minute, Jo-Jo, you don't have to do it like this. I'll give you whatever you want. I got a girl in here." A few minutes later, Girlfriend saw Appellant walk past the bedroom. He returned and stared at her laying in the bed; she looked at him and got scared so she rolled over to act like she was asleep. After another few minutes, Girlfriend heard the screen door and then a gun shot. Appellant then came back into the bedroom and grabbed a cell phone. Girlfriend then got out of bed and hid in the closet. Girlfriend left the closet when she heard the victim's roommate opening the front door and Appellant and Jo-Jo going out the side door. She ran to the kitchen and the roommate was already there.
 {¶ 11} Girlfriend continued testifying to the following. The victim was lying on the kitchen floor in a pool of blood and he was gasping for air. Girlfriend called 911; the roommate left the house because he was scared. Girlfriend spoke with the police when they arrived. She was upset and initially forgot to tell them about Appellant retrieving the cell phone after the shooting and about the roommate coming home.
 {¶ 12} Girlfriend testified on cross-examination that she suspected the victim sold drugs for a living, but never asked him what he did for a living.
 {¶ 13} John Gardner, from the Ohio Bureau of Criminal Identification and Investigation ("BCI"), testified to the following for the State. Mr. Gardner testified that the bullet and casing recovered from the shooting was fired from the gun recovered by the police. He also examined the t-shirt the victim was wearing and determined that he was shot at close range, essentially an inch or less.
 {¶ 14} Mr. Gardner testified to the following on cross-examination. The recovered gun was not checked for fingerprints, but was swabbed for DNA. The gun in question did not have a "hair trigger." In order for the gun to fire "something" needed to be on the trigger.
 {¶ 15} Mr. Gardner testified on re-direct examination that the gun at issue had to be manually cocked and someone had to pull the trigger for the gun to fire.
 {¶ 16} Donna Rose, from BCI, testified to the following for the State. She performed the gun shot residue tests on Appellant, Jo-Jo, and the victim. Jo-Jo's test revealed "[p]articles highly indicative of gunshot residue were identified on the left hand and right hand samples[.]" The victim's results showed "particles highly indicative of gun shot primer residue were identified on the left-hand and right-hand samples[.]" Appellant's results revealed that particles highly indicative of gunshot primer residue were not identified on his hand samples. Ms. Rose explained that the presence of gunshot residue indicates that a person handled something that had gunshot residue, they fired a weapon, or been near someone that has fired a weapon. She testified that if Jo-Jo held a gun at the victim's chest, it would not be unusual for both of them to test positive for gunshot residue.
 {¶ 17} Ms. Rose testified on cross-examination that a person can shoot a gun and test negative for gunshot residue.
 {¶ 18} The victim's roommate, Raymond Seagers ("Roommate") testified to the following for the State. Roommate was at his girlfriend's the night of the shooting, but returned home in the early morning hours. He arrived home via cab about 2:30 a.m. and noticed an unoccupied, running burgundy Explorer with tan trim in front of the house. He thought it was unusual that a car would be left running at that time with no one in it. Roommate proceeded to the front door, as he started to unlock the second lock he heard a "loud pow, a loud bang" and heard screaming. He went in the house and saw Girlfriend standing there crying. Roommate testified that he asked her what happened and she said someone just shot the victim. He went into the kitchen and saw the victim on the floor; he instructed Girlfriend to call 911. Roommate testified that he panicked and left. As he left out the front door, he noticed the Explorer was no longer in front of the house.
 {¶ 19} The State next called Dwane Henderson and he testified to the following. In the early morning hours of May 3, 2005, around 2:30-3:00 a.m., he left his house and saw Jermaine and Jeremiah Stewart and Jermaine Powell sitting outside the house in a gray Suburban. Mr. Henderson spoke with them and then went to the grocery store. As he left he heard police sirens.
 {¶ 20} Dale Laux, from BCI, testified that he tested Jo-Jo's tennis shoes and they tested positive for blood.
 {¶ 21} On cross-examination, Mr. Laux testified that he could not tell if the blood was human and that none of Appellant's clothes tested positive for blood.
 {¶ 22} Melissa Zielaskewicz, also from BCI, testified to the following. She testified that the blood on Jo-Jo's shoe was too small of a sample to obtain a DNA conclusion. She also tested a DNA swab from the gun used to kill the victim and she found that the "partial DNA profile from the swabbing of the trigger is consistent with [Jo-Jo]." The expected frequency of the profile was 1 in 3,591 individuals. Ms. Zielaskewicz testified that her conclusion that it was Jo-Jo's DNA on the trigger was to a reasonable degree of scientific certainty.
 {¶ 23} Ms. Zielaskewicz testified to the following on cross-examination. She did not have enough DNA to confirm the DNA on the trigger as Jo-Jo's but it could not be excluded as his DNA. She could not say to a reasonable degree of certainty when the DNA was left on the trigger.
 {¶ 24} Dr. Paul Matus, the Lorain County Coroner, testified that he performed the autopsy on the victim and determined that he died from exsanguinations or excessive bleeding due to a gunshot wound to the chest.
 {¶ 25} Jermaine Stewart ("J.S.") testified to the following for the State. He and his twin brother Jeremiah were together on the evening of May 2, 2005, but later separated. J.S. saw his brother again that night at Yolanda Sullivan's ("Yolanda") house; Jermaine Powell, Jo-Jo, Appellant, and George Smith were also there. The other men were talking about doing something. J.S. testified that he did not know exactly what they were talking about, but he knew it was not something he wanted to be involved in. As everyone got ready to leave the house, J.S.'s brother called him aside and J.S. told his brother to come with him. J.S. testified that he knew the others were "going to go do something bad." He knew it was something bad because they wouldn't let him hear their plans and they knew he wouldn't let his brother go if it was something bad. J.S. then grabbed his brother by the arm and made him come with him and Jermaine Powell; J.S. told George Smith that he could meet up with them later. George Smith,[5] Appellant, and Jo-Jo left in "like a red SUV." J.S. then traveled to Mr. Henderson's house and the group spoke with him as he left his house to go to the grocery store. After Mr. Henderson left, J.S. received a phone call from George Smith ("George") asking to be picked up by the Gyro House. As J.S. was driving to the Gyro House, George called again and told J.S. to hurry up. When J.S. arrived at the Gyro House, George ran into the car and was quickly followed by Appellant and Jo-Jo; all three were talking at the same time telling J.S. to "go, go, go, go, go."
 {¶ 26} J.S. continued testifying to the following. He heard Appellant say "you shot him." To which Jo-Jo replied "no, I didn't." Appellant kept saying "yes, you did. I seen it. I seen you when you shot him." J.S. wanted to get them out of his car, but he didn't want to make them mad so he kept driving around town. Appellant told J.S. to take him to Dayton and to other states. J.S. testified that he told Appellant he couldn't take him there because it was not his car and he did not have a driver's license. George was the only person in the car with a driver's license so he took over driving. Appellant told everyone in the car that if anything happened to Jo-Jo, he (Appellant) would come for them. J.S. testified that he remembered looking in the rear view mirror and seeing Jo-Jo crying in the back seat. As they were driving Jo-Jo called Yolanda to see if he really shot the victim because he wasn't sure if he did.
 {¶ 27} J.S.'s testimony continued as follows. It was decided that Appellant and Jo-Jo needed a hotel room. By now the group was in downtown Cleveland. They found a hotel that did not require identification to get a room and Appellant and Jermaine Powell got the hotel room. Appellant and Jo-Jo did not have any money so George gave them some money. On the way back to Yolanda's house a female called J.S.'s cell phone and asked what they did; when he asked her what she meant she told him they had killed someone. J.S. hung up the phone and told George the victim was dead. J.S. reluctantly testified that George asked him to lie for him and say that the gun just went off and that George did not leave with Appellant and Jo-Jo. J.S. originally agreed and lied to the police, but he eventually told the police the truth and what he knew about the shooting.
 {¶ 28} J.S. testified to the following on cross-examination. George told J.S. that Jo-Jo shot the victim and J.S. believed George even though George asked J.S. to lie for him. When Appellant said "you shot him" George was also in the car. George did not say anything about Appellant shooting the victim. When J.S., his brother, Jermaine Powell, and George returned to Lorain County, George called his mother. Later that morning, George, J.S., and Jeremiah and their mothers and other family members went to a lawyer's office.
 {¶ 29} On re-direct examination, J.S. testified that he was the most scared of Appellant because he acts crazy. J.S. reiterated Appellant's statements in the car about coming after anyone that told on them. Specifically, Appellant said he would "fly a helicopter into the fucking bar. I'll come get everybody." J.S. recognized Jo-Jo's voice when he responded to Appellant's statement about the victim getting shot.
 {¶ 30} Sergeant Mark Carpentiere, of the LPD, testified to the following. After conversations with George and the Stewart twins, he went to an alley behind a Discount Auto Sales and retrieved the gun previously discussed by the BCI technicians; the gun was partially buried in the dirt. Down the street from where he recovered the gun, Sgt. Carpentiere also located the Ford Explorer that was used the in the instant matter.
 {¶ 31} Sgt. Carpentiere testified on cross-examination that George told him either Jo-Jo or Appellant threw the gun from the Explorer after the shooting.
 {¶ 32} On re-direct examination, Sgt. Carpentiere testified to the following. George told him that he had purchased drugs from the victim and discovered that the drugs were bad so he was going to return to the victim's house and get his money back. George also told Sgt. Carpentiere that Appellant and Jo-Jo invited themselves along; George entered the house, Appellant and Jo-Jo followed and a confrontation occurred and a gun was shown. Sgt. Carpentiere continued his testimony saying that George informed him that he left the room where the victim was, heard a shot, and when he returned the victim was bleeding.
 {¶ 33} Officer Kevin Ishler, of the Cuyahoga Metropolitan Housing Authority Police Department, testified to the following. He was involved in Appellant's arrest and when Appellant was apprehended he was carry a bag of food and also a small bag of crack cocaine. While Appellant was in the back of Officer Ishler's police cruiser he was fidgeting around. After Appellant was removed from the cruiser, Officer Ishler found a large bag of suspected crack cocaine in the same area where Appellant was fidgeting. Officer Ishler testified that the area was checked before Appellant was placed in the car and no drugs were present.
 {¶ 34} Jeremiah Stewart ("Jeremiah"), J.S.'s twin brother, testified to the following for the State. Jeremiah was at Yolanda's house the evening of the shooting. He was with George, Appellant, and Jo-Jo when they were talking about a "lick plan." Jeremiah explained that a "lick" is a robbery. The three asked Jeremiah to participate in the lick and he told them no. George told Jeremiah the victim was the target of the lick. The group then left the house in two vehicles; Jeremiah, J.S., and Jermaine Powell in one car and George, Jo-Jo, and Appellant in a burgundy Explorer or Jimmy. Jeremiah, J.S., and Jermaine Powell went to Mr. Henderson's house and spoke with him until George called and asked to be picked up at the Gyro house. Jeremiah testified that when they arrived at the Gyro House, George, Jo-Jo, and Appellant were running towards the car and they seemed "scared." While in the backseat, Appellant faced Jo-Jo and said "you shot him." George told Jeremiah that Jo-Jo shot the victim. Jeremiah continued his testimony and described the remainder of the evening in the same manner as J.S. had previously.
 {¶ 35} On cross-examination, Jeremiah testified that George told him the shooting was an accident and that the gun went off when the victim hit it with his hand.
 {¶ 36} Jermaine Powell ("Jermaine") testified to the following for the State. He was at Yolanda's house the night of the shooting. He attempted to enter the basement where the rest of the men were having a conversation and he was instructed to stay upstairs. Jermaine testified to the same events already testified to by J.S. and Jeremiah. He also testified that Appellant, George, and Jo-Jo admitted a gun had been pointed at the victim and they claimed that the victim some how hit the gun and it fired.
 {¶ 37} Detective Edward Bermudez of the LPD testified to the numerous photographs he took of the crime scene and the evidence collected. Det. Bermudez was involved in the recovery of the Explorer and found several pieces of paper with Yolanda's name on it in the vehicle.
 {¶ 38} Detective Steyven Curry of the LPD testified to the following. He obtained George's cell phone records and they revealed that he called the victim twice before the homicide and that he called the twins twice after the homicide. Det. Curry also confirmed Roommate's statement that he arrived home via cab around 2:30 a.m. Det. Curry testified that George never denied being present when the victim was shot. Det. Curry confirmed that Jo-Jo had access to the burgundy Explorer described by the previous witnesses as being at the crime scene and later abandoned by where the gun was found. He also testified that George was also charged in the murder and was currently incarcerated.
 {¶ 39} After the admission of several State exhibits, Appellant made a Crim.R. 29 motion. The trial court denied the motion.
 {¶ 40} Appellant called George as his first witness and George invoked his Fifth Amendment right against self-incrimination; thus George did not provide any testimony. Appellant then rested his case without calling any other witnesses or presenting any evidence. Appellant later renewed his Crim.R. 29 and the trial court overruled the motion.
 {¶ 41} After careful review of the entire record, weighing the evidence and all reasonable inferences and considering the credibility of the witnesses, this Court cannot conclude that the jury clearly lost its way when it found Appellant guilty of aggravated robbery, felony murder, and felonious assault. The jury was in the best position to evaluate the credibility of witnesses and give proper weight to their testimony. See Statev. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. Contrary to Appellant's argument, his convictions were not against the manifest weight of the evidence simply because the jury chose to believe the evidence of Appellant's guilt offered by the prosecution. State v. Gilliam (Aug. 12, 1998), 9th Dist. No. 97CA006757, at 4. "[I]n reaching its verdict, the jury is free to believe, all, part, or none of the testimony of each witness." Prince v. Jordan, 9th Dist. No. 04CA008423,2004-Ohio-7184, at ¶ 35, citing State v. Jackson (1993),86 Ohio App.3d 29, 33. Furthermore, the jury, as the fact finder, was entitled to reconcile any differences and inconsistencies in the testimony and determine that the manifest weight of the evidence supported the conviction of Appellant. See DeHass,
supra. Making every reasonable presumption in favor of the judgment, we cannot find that the record weighs heavily against the convictions.
 {¶ 42} Based on the foregoing, this Court cannot find that Appellant's convictions were against the manifest weight of the evidence. Accordingly, Appellant's second assignment of error lacks merit.
 Assignment of Error Number One
"THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT REFUSED TO ALLOW A JURY INSTRUCTION ON THE OFFENSE OF RECKLESS HOMICIDE."
 {¶ 43} In his first assignment of error, Appellant has argued that the trial court erred in denying his request for a jury instruction on reckless homicide. Specifically, Appellant has argued that the trial court abused its discretion by not allowing the jury to consider reckless homicide as lesser included offense of murder. We disagree.
 {¶ 44} When reviewing a trial court's jury instructions, this Court reviews the record to determine whether the trial court's decision to give or decline to give a requested jury instruction constitutes an abuse of discretion under the facts and circumstances of the case. State v. Wolons (1989),44 Ohio St.3d 64, 68. "The term `abuse of discretion' connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable." Blakemore v.Blakemore (1983), 5 Ohio St.3d 217, 219.
 {¶ 45} Appellant has argued that he should have received a reckless homicide instruction as a lesser included offense of his felony murder charge. Pursuant to R.C. 2903.02(B), "No person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]" The trial court instructed the jury that to convict Appellant of murder it must find that he caused the death of the victim "[a]s a proximate result of attempting to commit an offense of violence, to wit: Aggravated Robber[y], a felony of the First Degree, or Felonious Assault, a felony of the Second Degree[.]" The judge explained that cause is "an act or failure to act which, in the natural and continuous sequence, directly produces the physical harm to the person, and without which the harm would not have occurred." The judge continued: "[t]he Defendant's responsibility is not limited to the immediate or most obvious result of the defendant's act. The Defendant is also responsible for the natural and foreseeable results which follow in the ordinary course of events from the act or failure to act. There may be one or more cause of an event."
 {¶ 46} Pursuant to the instruction requested by Appellant, reckless homicide entails "recklessly caus[ing] the death of another[.]" R.C. 2903.041. A person acts recklessly "when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result[.]" R.C. 2901.22(C).
 {¶ 47} Determining whether the lesser included offense instruction was warranted is a two-step process. First we must decide if the proposed lesser included offense is actually a lesser included offense of the charged offense, then we review whether the instruction was required in the instant matter. An offense is considered to be a lesser included offense of another if:
"(i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense. State v. Deem (1988), 40 Ohio St.3d 205, 209.
 {¶ 48} Applying the Deem test, we find that reckless homicide is a lesser included offense of felony murder. SeeState v. Berry, 8th Dist. No. 83756, 2004-Ohio-5485, at ¶ 48; see also, State v. McCurdy, 1st Dist. No. C-020808,2003-Ohio-5518, at ¶ 14. Specifically, pursuant to R.C. 2903.041, reckless homicide is a felony of the third degree, which carries a lesser penalty than felony murder. Next, one cannot cause the death of another under R.C. 2903.02(B) without also causing the death of another under R.C. 2903.041. Lastly, the mens rea/causation element of felony murder is clearly different than the mens rea of reckless homicide. As previously discussed, reckless homicide requires "a heedless indifference to the consequences" and a "disregard" of a known risk. While felony murder requires a "knowing" mens rea and an underlying felony that results in the death of the victim. See R.C. 2903.02(B). Based on the foregoing, we find that reckless homicide is a lesser included offense of felony murder. Accordingly, we must determine if the reckless homicide instruction was warranted in this case.
 {¶ 49} While a crime may constitute a lesser included offense, it does not follow that a lesser included offense instruction is mandatory; "[a]n instruction on a lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction on the lesser-included offense." State v.Carter (2000), 89 Ohio St.3d 593, 600. Moreover, the lesser included offense instruction is not warranted every time "some evidence" is presented to support the inferior offense. State v.Shane (1992), 63 Ohio St.3d 630, 632. Rather, a court must find "sufficient evidence" to "allow a jury to reasonably reject the greater offense and find the defendant guilty on a lesser included (or inferior degree) offense." (Emphasis sic.). Id. at 632-633. In making the determination of whether the instruction was required, the reviewing court must view the evidence in a light most favorable to the defendant. State v. Smith (2000),89 Ohio St.3d 323, 331.
 {¶ 50} Having reviewed the record and given the totality of the evidence, we cannot say that the jury could have reasonably acquitted Appellant of felony murder and found him guilty of the lesser included offense of reckless homicide. Accordingly, the trial court did not abuse its discretion by not giving the reckless homicide instruction. Appellant's first assignment of error lacks merit.
 III {¶ 51} Appellant's two assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to Appellant.
Slaby, P.J., Boyle, J., concur.
[1] Appellant was found guilty of aggravated robbery, murder, having weapons under disability, tampering with evidence, and felonious assault. The jury also found the firearm specifications proven for each of his convictions.
[2] Appellant has not argued that his convictions for tampering with evidence and having weapons under disability are against the manifest weight of the evidence; therefore, we will not address those convictions.
[3] The jury instructions included a conspiracy instruction for each charge.
[4] The victim in this matter was Mark Riley; given the large number of witnesses and parties in this matter, we refer to some of them by their status in the case.
[5] George Smith is cousins with J.S. and Jeremiah.