THE STATE OF OHIO, APPELLEE, *v.* TRIMBLE, APPELLANT.

[Cite as *State v. Trimble,* 122 Ohio St.3d 297, 2009-Ohio-2961.]

*Criminal law — Aggravated murder — Death penalty upheld.*

(No. 2005-2436 — Submitted March 10, 2009 — Decided June 30, 2009.)

APPEAL from the Court of Common Pleas of Portage County, No. 2005 CR 0022.

_____

MOYER, C.J.

{¶ 1} On the evening of January 21, 2005, James E. Trimble, the defendant-appellant, shot and killed his girlfriend, Renee Bauer, and her seven-year-old son, Dakota Bauer, at their home in Brimfield Township, Ohio. Trimble then fled the scene on foot. Later that evening, he broke into a nearby residence and took the occupant, Sarah Positano, hostage. After a police SWAT team surrounded the residence, Trimble shot and killed Positano. Trimble was convicted of the aggravated murder of Renee, Dakota, and Positano and was sentenced to death.

{¶ 2} Trimble now appeals to this court as a matter of right.

*State's case*

{¶ 3} During October 2003, Trimble and Renee Bauer started dating. Shortly thereafter, Trimble, Renee, and Dakota began living together in a home at 880 Sandy Lake Road in Brimfield Township.

{¶ 4} Trimble kept numerous guns, including pistols, assault rifles, and military weapons, plus ammunition in his home. Darrell French, a neighbor, often heard Trimble firing his guns in the woods behind his home.

{¶ 5} Trimble and Renee's relationship started to dissolve as they began to fight and argue. Trimble frequently complained to Darrell and Angela French that Renee was "fuckin' bitching all the time."

**{¶ 6}** In October 2004, Trimble and Renee attended a birthday party at the French home. Trimble and Renee had a quarrel, and Renee left the party. Trimble remained at the party, became drunk, and complained about Renee. Before he finally left, Trimble stated that he was in the mood to go home and "blow something up." Shortly thereafter, Darrell heard Trimble firing guns in the woods.

**{¶ 7}** At 7:18 p.m. on January 21, 2005, Elizabeth Trimble Bresley, the defendant's mother, called Trimble on his cell phone. When she called, Trimble was at home, waiting for a pizza delivery. Bresley heard the doorbell ring and heard Trimble tell Dakota to "give this money to the pizza man." Trimble then ended the phone call.

**{¶ 8}** At 8:10 p.m., Bresley made another call to Trimble. She asked how things were going, and Trimble said, "Not too well. I shot Renee and Dakota." Trimble ended the conversation. Bresley then called her other son, Arthur Trimble, who lives in Florida, and told him that something had happened at his brother's house. She asked Arthur to find out what had happened.

**{¶ 9}** Shortly thereafter, Arthur called Trimble and asked what happened. Trimble said, "I killed the fucking bitch." Arthur said, "You did what?" Trimble replied, "Yep, she's fucking dead," and the boy was "dead, too." Arthur told Trimble to stay where he was because he was going to call the police. Trimble said that he was not going to stay where he was because his life was over. After their conversation ended, Arthur called the Brimfield Township Police Department. Arthur told the police dispatcher to send officers to his brother's address on Sandy Lake Road because his brother had told him that he had killed two people there that evening.

**{¶ 10}** Around 9:00 p.m. on January 21, Trimble approached the home of Steven Reichard on Ranfield Road in Brimfield Township. Reichard was working in his garage when he heard a tree branch break. He stepped outside and

saw the silhouette of a man standing near a wood pile. Reichard could not see the man's face, but he was dressed in camouflage clothing.

{¶ 11} Reichard asked the man what he was doing, and Trimble ordered, "Put your fucking hands up." Reichard asked, "What are you, fucking crazy?" Trimble replied, "That's right, I'm crazy. I just killed three people." Reichard raised his hands because Trimble had a rifle. Reichard pleaded for his life as they continued talking. Trimble said, "Only thing I can tell you is that you're at the wrong place at the wrong time." Trimble then stepped forward to shoot Reichard.

{¶ 12} At that moment, Lois Scott, Reichard's mother, came out the back door of the house. Reichard identified his mother, and Trimble told him to "[g]et her over here." After Scott came over, Trimble said he had to shoot both of them: "You guys can identify me." Reichard replied that he could not see Trimble's face. Trimble then said he was going to take Reichard hostage so that his mother would not call the police. Reichard told Trimble that Trimble had another option: to turn around and walk away. Trimble said, "All right. I'm going to turn around and I'm going to walk away slowly. You move and you're dead. And you call the cops and I'll kill you." Trimble then left through the back of the property. After he departed, Reichard called the police.

{¶ 13} Around 9:00 p.m., police officers were dispatched to 880 Sandy Lake Road to check on the report of the killings. Brimfield patrolman Amber Peterson and Portage County Sheriff's officer Trent Springer went to the back of the house after receiving no response to a knock at the front door. They looked through a rear window and saw a body lying on the floor.

{¶ 14} After entering the house, police officers found Renee's and Dakota's bodies on the floor in the master bedroom. Renee's body was face down and lying partly on top of Dakota. Both bodies were fully dressed and wearing jackets. In searching the house, police found Renee's purse and a duffel bag containing clothing for an adult female and a child on a living room chair. In

the dining room, they also found clothing. A piece of paper with a phone number for a battered-women's shelter was found on the refrigerator.

{¶ 15} About 9:37 p.m. on January 21, Brimfield Chief of Police David Blough requested assistance from the Metro SWAT (Special Weapons and Tactics) team to help apprehend Trimble. Around 10:20 p.m., Trimble was reported firing shots at police officers on Ranfield Road. At 11:13 p.m., the SWAT team assembled and proceeded towards the area where Trimble had been spotted.

{¶ 16} At 11:18 p.m. on January 21, Sarah Positano, a 22-year-old college student, called 911 and reported that a man had entered her duplex at 3729B Ranfield Road. Positano said the man wanted the police to leave the area, and he would shoot her if the police entered the residence. During the call, Positano could be heard asking Trimble, "Could you not put the gun to my head?"

{¶ 17} During the 911 call, Trimble told the operator that he has a "9-mm pistol with no safety." Trimble said, "I have got the hammer held back [and] the trigger pulled. So if the cops shoot me or even attempt to break in here, I will let go of the trigger and the innocent girl will die." He also told the operator that he could see a policeman outside the window "looking in" and added, "I don't really appreciate that."

{¶ 18} Following Positano's call, the SWAT team established a perimeter around the duplex. Meanwhile, Mike Korach, the SWAT team hostage negotiator, twice made phone contact with Trimble. During the first call, Trimble repeated that he had a gun with no safety, that his finger was on the trigger, and that he would kill the girl if the police entered the residence. On the second call, Trimble identified himself as "Camo Jim." Trimble also warned the police that he had already killed two people that had "fucked" with him.

{¶ 19} As the phone conversation progressed, Trimble said that he did not want to "hurt any innocents" and just wanted the police to go away. Trimble

4

mentioned that he had come into contact with two other people whom he could have killed. However, he did not kill them because they did what he wanted them to do. Trimble said, "Look, if you just give me a couple hours to get my shit together, I'll let her go." At Korach's request, Trimble repeated that promise to Positano. Korach then lost phone contact with Trimble and was unable to reestablish it.

{¶ 20} While Korach talked with Trimble, Lieutenant Richard Baron, an Ohio State Highway Patrol hostage negotiator, maintained phone contact with Positano. Positano told Baron that Trimble was standing right behind her in the upstairs hallway with a gun pointed at her head. During the call, Trimble can be heard telling Positano, "Sarah, in two hours you're going to go home * * * if the cops don't come up here." A few seconds later, Positano can be heard screaming, "I've been shot" and starting to gasp for breath. A short time later, the phone connection was lost.

{¶ 21} At 12:05 a.m. on January 22, 2005, Lieutenant Baron notified Chief Blough that he had lost phone contact with Positano after hearing her scream and make gasping noises. However, Baron did not report that Positano had been shot, because he did not hear Positano say so or hear the gunshot. As a result, Chief Blough did not order the SWAT team to enter the residence until more than seven hours later.

{¶ 22} At 12:10 a.m., Trimble fired shots from the residence towards the SWAT team. Chief Blough then issued a "Delta order" authorizing the SWAT team to use deadly force without asking for permission. At 12:35 a.m., after more gunfire came from the residence, SWAT team snipers fired three gunshots in return. Between 12:39 a.m. and 2:32 a.m., Trimble continued to fire shots towards the SWAT team.

**{¶ 23}** At 7:30 a.m., the SWAT team entered the residence. Positano's body was found lying in the upstairs hallway. Trimble was arrested, taken into custody, and transported to the Portage County jail.

**{¶ 24}** On the morning of January 24, 2005, Portage County Sheriff Duane Kaley was informed that Trimble wanted to talk with him. Trimble was brought to Kaley's office. After waiving his *Miranda* rights, Trimble provided a taped interview. Trimble stated that he wanted "to get this over with and not make any more people suffer than have already suffered." He said, "I'm admitting I did everything" and committed "[t]hree murders."

**{¶ 25}** Trimble said he did not remember shooting Renee and Dakota. However, he said, "I must have. No one else was there." Trimble said, "The last thing I remember is me and Dakota were down in the basement, and we were getting ready to shoot his BB gun * * *." He next remembered running through the woods and talking on his cell phone to his mother and brother. Trimble remembered taking an AR-15 semiautomatic rifle and a 9-mm handgun from his gun safe and six or seven ammunition clips before leaving his home. Trimble also remembered meeting some people in the woods and telling them to leave him alone and not to call the police.

**{¶ 26}** During the interview, Trimble refused to discuss whether he had had an argument with Renee before the shootings because "why it happened is irrelevant."

**{¶ 27}** Trimble said he went to Positano's residence because he "just kept running through the woods and that's where [he] ended up." Trimble claimed that he shot Positano after the police entered the residence. He said, "I had the hammer cocked and the police came in the house and I turned to look at them and [the gun] went off." According to Trimble, the police entered the residence and then left: "They fired one shot, I fired a couple of shots. They * * * fired a couple

6

of more shots before they went out the door." Trimble said, "I didn't pull the trigger," and "I didn't mean to shoot her."

{¶ 28} At trial, Sheriff Kaley testified that Trimble's explanation for shooting Positano was not consistent with the facts. Kaley stated that the SWAT team entered Positano's residence only one time, and that was when Trimble was arrested and taken into custody.

{¶ 29} Special Agent John Saraya, a crime-scene agent at the Ohio Bureau of Criminal Identification and Investigation ("BCI"), examined the Sandy Lake Road crime scene and collected evidence. Saraya found bone fragments and hair at various locations around the master bedroom and in the adjoining bathroom. Blood spatter was found on the bottom of the dresser near Renee's head and on the bottom of the shower stall.

{¶ 30} Saraya collected 19 cartridge casings from the floor and top of the dresser in the master bedroom. The cartridges were from .223-caliber high-velocity rounds. Bullet holes were found in the dresser, the wall behind the dresser, the baseboard, and the floor. Saraya determined that the path of the gunshots was from "an upper direction at a slight downward angle."

{¶ 31} In the basement, Saraya found a long gun case that was open and empty. There were also military belts, magazine pouches, a handgun, and three long guns leaning against the wall. After obtaining a search warrant, Saraya opened a large gun safe that was in the basement. He found 19 guns, including handguns, semiautomatic rifles, an assault rifle, and carbines. He also found 9 mm bullets and .223-caliber rounds of ammunition that matched the casings found in the bedroom.

{¶ 32} Saraya also examined the crime scene at Positano's residence. Positano suffered a bullet wound in the neck, and a spent 9 mm bullet was found inside her clothing. Trimble's empty prescription bottle of the anti-anxiety drug

Lorazepam and a set of dog tags with Trimble's name on them were found near Positano's body in the upstairs hallway.

{¶ 33} Saraya recovered twenty-six .223-caliber casings and nineteen 9 mm casings inside the residence. An AR-15 rifle that fires .223-caliber ammunition was recovered in the north bedroom. Trimble's empty prescription bottle for Hydrocodone, a pain medication, was found behind the bedroom door. A Sig Sauer 9 mm handgun and Trimble's wallet were found in the adjoining bathroom. Trimble's wallet contained $767 in cash, $185.79 in checks made payable to him, and Lorazepam in powdered form.

{¶ 34} Saraya identified two bullet holes in the interior wall that were caused by sniper fire. One bullet had followed a trajectory through the patio door frame into the house, and the other bullet had followed a trajectory through the patio glass door into the house. At trial, Saraya acknowledged that there was a third bullet hole in the wall that had been caused by sniper fire and that he had failed to notice it at the crime scene.

{¶ 35} Jonathan Gardner, a firearms examiner at BCI, examined the 19 cartridge casings collected from Trimble's home and determined that they had all been fired from the AR-15 rifle recovered from Positano's residence. Gardner also determined that 18 of the .223-caliber casings collected from Positano's residence had been fired from the AR-15. He testified that the remaining casings lacked sufficient individual characteristics to make a comparison. Gardner also testified that a shooter would have to pull the trigger of the AR-15 once for each round of ammunition fired.

{¶ 36} Gardner determined that all 9 mm casings recovered from Positano's residence had been fired from the 9 mm handgun found there. He testified that the handgun has a four-and-one-half-pound trigger pull when the hammer has been cocked, which is "typical for this type of gun." By examining

8

the gunshot residue around the bullet hole in her jacket, Gardner also determined that the gun had been fired less than 12 inches from Positano.

{¶ 37} Dr. George Sterbenz, the Chief Deputy Medical Examiner for Summit County, conducted the autopsy of Renee. Dr. Sterbenz found that Renee had died from multiple gunshot wounds. She was shot once in the front of the head, 11 times in the back, and in the hand. Dr. Sterbenz also found bruises on Renee's upper left thigh, her right thigh, and above her elbow that were blunt-force injuries. These were not fresh bruises and could have been caused hours or days before her death. A toxicology screen showed that Renee's blood-alcohol level at the time of death was .173 percent.

{¶ 38} Dr. Sterbenz also conducted the autopsy of Dakota. Dr. Sterbenz determined that Dakota had also died from multiple gunshot injuries. Dakota received six gunshot wounds in his head, neck, torso, and upper extremities. Dr. Sterbenz testified that two of the entrance wounds are "atypical and characteristic of wounds of re-entry meaning the projectile has traveled through * * * some intermediate target" before striking Dakota.

{¶ 39} Dr. Dorothy Emma Dean, the Deputy Medical Examiner for Summit County, conducted the autopsy on Positano. Dr. Dean determined that Positano had died from a gunshot wound to the neck with perforation of her carotid artery and left lung.

### Defense case

{¶ 40} The defense called nine witnesses and introduced photographs and other documentary evidence.

{¶ 41} Captain John Ristity, a Portage County Sheriff's officer, took photographs of Trimble after he had been arrested and taken to the hospital. These photographs show a lump over Trimble's left eye, a bloody nose with blood streaming across his face, facial bumps and bruises, and a bruise on his upper

right arm. Another photograph shows a brownish-red stain on the side of Trimble's underwear.

{¶ 42} Patricia Wain, a member of the SWAT team, had been the record keeper for the SWAT team's timeline of events for January 21 and 22. Wain testified that negotiators made contact with Trimble at the Ranfield duplex at 11:41 p.m. At 12:02 a.m., negotiators reported that Trimble had terminated his call and wanted a two-hour time break and would then release Positano and kill himself. At 12:04 a.m., gunshots were heard inside the residence. Between 12:09 p.m. and 2:32 a.m., shots were fired from Positano's residence on 13 occasions, and snipers returned fire on one occasion.

{¶ 43} Monica Moll, another member of the SWAT negotiation team, testified that she had relayed information to command authorities that Korach had obtained in talking on the phone with Trimble. The information broadcasted by Moll could be heard by all SWAT team members.

{¶ 44} Trooper Ronald Schneider, an Ohio State Highway Patrol investigator, prepared a timeline for Positano's 911 phone calls. He testified that at 11:14:14 p.m. on January 21, Positano initiated the 911 call. At 12:02:23 a.m. on January 22, Positano screamed and twice said, "I've been shot." Thereafter, she could be heard gasping until 12:04:20 a.m. At 12:06:57 a.m., multiple gunshots were heard, and at 12:07:08 a.m., a single gunshot was heard.

{¶ 45} Scott Robertson, the SWAT team commander, testified that at 11:13 p.m. on January 21, the SWAT team began moving out from its staging area. At 11:17 p.m., Robertson was advised that the suspect was located at 3729 Ranfield Road, Apartment B. However, the SWAT team had trouble locating the duplex, according to Robertson. At 11:50 p.m., they identified the duplex. Sniper teams were positioned.

{¶ 46} At 12:10 a.m., Robertson requested a "Delta order" after shots were fired at the SWAT team. The SWAT members began notifying

neighborhood residents to stay in the backs of their homes, and Trimble continued to fire at them. At 12:35 a.m., snipers returned fire with three shots. Robertson testified that no additional sniper fire was directed at the residence. During cross-examination, Robertson testified that no one on the SWAT team was either authorized or deployed to enter Positano's residence between midnight and 12:20 a.m.

{¶ 47} Kenneth Ciesla, an assistant SWAT team commander, was a member of the team that entered Positano's residence at 7:30 a.m. He testified that after entering the residence, the SWAT team determined that Trimble was partially barricaded in an upstairs bedroom. A tear-gas canister was thrown into the bedroom after Trimble had ignored orders to surrender. Trimble then emerged from the bedroom on his hands and knees. When Trimble collapsed on his hands and refused to show them, Ciesla sprayed Trimble's face with pepper spray. Ciesla also gave Trimble two knee strikes in the thigh because he refused to be handcuffed. Ciesla did not observe any other blunt force used against Trimble. He testified that no member of the entry team caused Trimble's injuries, and he does not know how they occurred.

{¶ 48} Jeffrey Film, an assistant SWAT team commander, was in charge of the entry team. Film testified that he dragged Trimble down the hallway after he emerged from the bedroom. He pinned Trimble to the floor by placing pressure on his back and neck area after Trimble refused to release his left arm to be handcuffed. Other officers tried to subdue him with a Taser, but the Taser did not work. Trimble's arm was forced loose, and he was handcuffed. Film did not see Trimble bleeding or notice abrasions or cuts on his face. Nor did Film see anyone strike Trimble in the face.

{¶ 49} Stephen Miller, a member of the SWAT entry team, and Film took Trimble downstairs after he refused to voluntarily walk down. Miller testified

that he did not look at Trimble's face and did not notice that Trimble had suffered any injuries.

{¶ 50} Larry Dehus, a firearms and ballistics expert, reviewed Saraya's report and examined the crime scene at Positano's residence. Dehus criticized the accuracy of Saraya's findings. Dehus testified that he located three bullet defects on the inner wall rather than the two defects identified in Saraya's report. He also criticized the accuracy of Saraya's floor plan because it was not drawn to scale. Further, Dehus stated that Saraya failed to use a string or laser to determine the trajectory of the bullets before concluding that they had been fired from outside the residence.

{¶ 51} Dehus testified that he took detailed measurements inside the residence and completed a scale drawing of the floor plan. He determined the angle of the bullet path using some of the measurements in Saraya's report. Dehus then projected a straight line for the trajectory of the bullet path, which showed that one of the bullets had been fired from the interior of the living room. Dehus concluded that the bullet had been fired four to six inches from the edge of the patio door frame.

{¶ 52} Dehus also conducted tests on the 9 mm handgun that killed Positano. He testified that the gun has an internal safety that prevents the hammer from falling and firing the weapon unless the trigger is fully depressed. His tests showed that the gun would not discharge by simply letting the hammer fall from a cocked position unless the trigger was fully depressed. Dehus also tested the gun to determine whether it would discharge if he simultaneously released his finger from the trigger and his thumb from the hammer and let the gun fall. Dehus testified that the gun had fired in one of the two times that he conducted this test.

### *Case history*

{¶ 53} Trimble was indicted on three counts of aggravated murder. Count 13 charged Trimble with the aggravated murder of Renee with prior calculation

and design.  Count 14 charged Trimble with the aggravated murder of Dakota, a child under the age of 13.  Count 15 charged him with the aggravated murder of Positano during a kidnapping, aggravated burglary, or burglary.

{¶ 54} Count 13 included a death-penalty specification for a "course of conduct," R.C. 2929.04(A)(5).  Count 14 included death-penalty specifications for a "course of conduct" and the murder of a child under 13 years of age, R.C. 2929.04(A)(9).  Count 15 included death-penalty specifications for a "course of conduct," murder for the purpose of escaping apprehension or detection, R.C. 2929.04(A)(3), murder while committing or attempting to commit kidnapping, R.C. 2929.04(A)(7), and murder while committing or attempting to commit aggravated burglary, R.C. 2929.04(A)(7).[1]

{¶ 55} Trimble was also charged with the following additional counts: Count 16 charged Trimble with aggravated burglary, Counts 17, 18, and 19 charged him with kidnapping, and Counts 20 and 21 charged him with felonious assault.  Each of these counts included a firearm specification.

{¶ 56} Trimble pleaded not guilty to all charges.  The jury found Trimble guilty, and he was sentenced to death.

### *Pretrial issues*

{¶ 57} *Change of venue*.  In proposition of law I, Trimble argues that the trial court erred by failing to grant a motion for change of venue.

{¶ 58} "[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd* (1961), 366 U.S. 717, 722, 81 S.Ct. 1639, 6 L.Ed.2d 751.  However, "pretrial publicity[,] even pervasive, adverse publicity[,] does not inevitably lead to an unfair trial."

---

1. During trial, Counts 1 through 12, which charged Trimble with the attempted murder of police officers on the night of the murders, and Count 22, which charged him with having weapons under a disability, were dismissed.  Firearm specifications included under Counts 13, 14, and 15 were also dismissed.

*Nebraska Press Assn. v. Stuart* (1976), 427 U.S. 539, 554, 96 S.Ct. 2791, 49 L.Ed.2d 683.

{¶ 59} A trial court may change venue "when it appears that a fair and impartial trial cannot be held" in that court. Crim.R. 18(B); R.C. 2901.12(K). Any decision on a change of venue rests in the sound discretion of the trial court. *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 34. A defendant claiming that pretrial publicity has denied him a fair trial must show that one or more jurors were actually biased. *State v. Treesh* (2001), 90 Ohio St.3d 460, 464, 739 N.E.2d 749. Moreover, we have held that "a careful and searching voir dire provides the best test of whether prejudicial pretrial publicity has prevented obtaining a fair and impartial jury from the locality." *State v. Bayless* (1976), 48 Ohio St.2d 73, 98, 2 O.O.3d 249, 357 N.E.2d 1035.

{¶ 60} The defense filed a pretrial motion requesting a change of venue. The trial court deferred ruling on the motion until an attempt had been made to select a jury. A jury was selected following extensive voir dire. The trial court then rejected the motion.

{¶ 61} Trimble used only five of his six allotted peremptory challenges. Thus, Trimble has waived his present claim because of his failure to exhaust his peremptory challenges. See *State v. Getsy* (1998), 84 Ohio St.3d 180, 189, 702 N.E.2d 866. We find that the trial court did not commit plain error in overruling the motion for a change of venue.

{¶ 62} During its pretrial-motion hearing, the defense presented evidence of extensive pretrial publicity reported in local newspapers, the Akron Beacon Journal and the Ravenna Record Courier. Newspaper articles disclosed detailed information about the murders and the victims, discussed Trimble's lengthy criminal record and his troubled past, and mentioned that Trimble was on probation for a federal firearms conviction at the time of the murders. There was

also a good deal of publicity on local radio and television stations about the murders.

{¶ 63} The trial court conducted extensive individual voir dire of prospective jurors. Two of the seated jurors and one of the alternate jurors did not remember any pretrial publicity. Another seated juror had talked to friends about the case, but had read or heard nothing about it in the media. The remaining seated and alternate jurors had heard or read something about the case in the news media. However, all of these jurors assured the court that they could set aside what they heard or read in the news media, remain fair and impartial, and decide the case based solely on the evidence presented in court.

{¶ 64} Though pretrial publicity was extensive, the trial court was in the best position to judge each juror's demeanor and fairness. The trial court selected a jury after conducting in-depth voir dire that encompasses over 2,450 pages of the record. Thus, we conclude that the trial court did not commit plain error in denying the defense motion for a change of venue.

{¶ 65} Based on the foregoing, we reject proposition I.

{¶ 66} *Defense jury challenges*. In proposition of law II, Trimble argues that the trial court erred by failing to excuse prospective jurors who would automatically vote for the death penalty. He also argues that the trial court erred by failing to excuse prospective jurors who were biased and by failing to excuse a prospective juror who had heard gunshots at the crime scene.

{¶ 67} However, Trimble has waived any objection to these overruled challenges because of his failure to exhaust his peremptory challenges. *State v. Getsy*, 84 Ohio St.3d at 191, 702 N.E.2d 866; see also *State v. Hale*, 119 Ohio St.3d 118, 2008-Ohio-3426, 892 N.E.2d 864, ¶ 87. We find that no plain error was committed in declining to grant the defense challenges.

{¶ 68} **1. Automatic-death-penalty challenges.** A capital defendant may challenge for cause any prospective juror who, regardless of the evidence of

aggravating and mitigating circumstances and in disregard of the jury instructions, will automatically vote for the death penalty. See *Morgan v. Illinois* (1992), 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492; *State v. Williams* (1997), 79 Ohio St.3d 1, 6, 679 N.E.2d 646. A trial court's ruling on a challenge for cause will not be disturbed on appeal absent an abuse of discretion. See *State v. Wilson* (1972), 29 Ohio St.2d 203, 211, 58 O.O.2d 409, 280 N.E.2d 915.

{¶ 69} Trimble alleges that the trial court erred in denying ten challenges for cause against automatic-death-penalty jurors. Of these ten challenges, six prospective jurors were excused for other reasons (Nos. 19, 28, 41, 201,[2] 205, and 213). Thus, the trial court's denial of Trimble's automatic-death-penalty challenges of these prospective jurors did not result in plain error.

{¶ 70} Another challenged juror, prospective juror No. 139, was selected as an alternate and later served on Trimble's jury during the mitigation phase of the trial after replacing a juror who became ill. This juror believed in the death penalty as an "eye for an eye" and would have that mindset if the defendant was found guilty. However, juror No. 139 had assured the court that he could listen to the evidence, follow the court's instructions, and vote for a life sentence if the state failed to prove beyond a reasonable doubt that the aggravating circumstances outweighed the mitigating factors. Thus, this juror's responses showed that he would not automatically vote for death. See *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 40 (no abuse of discretion in denying a challenge for cause if a juror, even one predisposed in favor of imposing death, states that he or she will follow the law).

{¶ 71} Of the remaining challenged jurors, prospective juror No. 14 and prospective alternate juror No. 133 were excused by defense peremptory challenges. The trial court's denial of automatic-death-penalty challenges of

---

2. The appellant mistakenly attributes the voir dire of prospective juror No. 201 to prospective juror No. 200.

these peremptorily challenged jurors was also not plain error. Prospective juror No. 14 believed that a case in which one person purposely killed another person would be the kind of case meriting the death penalty. However, prospective juror No. 14 stated that she would not automatically vote for the death penalty and would weigh the evidence and follow the court's instructions before deciding on a sentence.

{¶ 72} Prospective juror No. 133 believed in the death penalty as "an eye for an eye" and stated that it was appropriate for "[v]iolent, premeditated murders." However, prospective juror No. 133 also stated that he would listen to the evidence presented during mitigation, give meaningful consideration to life-sentencing options, and would follow the court's instructions before deciding on a sentence. These statements do not support the notion that juror No. 133 would automatically vote for a death sentence.

{¶ 73} **2. Juror bias.** Trimble also claims that the trial court erred in overruling his challenge for bias against jurors Nos. 139 and 28. A trial court has broad discretion in determining a juror's ability to be impartial. *State v. White* (1998), 82 Ohio St.3d 16, 20, 693 N.E.2d 772. "Thus, where a prospective juror is being challenged for bias, '[d]eference must be paid to the trial judge who sees and hears the juror.' " Id., quoting *Wainwright v. Witt* (1985), 469 U.S. 412, 426, 105 S.Ct. 844, 83 L.Ed.2d 841.

{¶ 74} Juror No. 139 learned about the murders from the newspapers, television, and conversations with co-workers. The juror stated that what he heard in discussions about the case was "not good for" Trimble and "that he's already guilty, but he's just trying to figure out if * * * it's insanity or not." Juror No. 139 expressed some uncertainty about whether he could set aside the opinions he heard about the case. Ultimately, juror No. 139 stated that he could set aside what he had previously learned about the murders, listen to the evidence presented in court, and follow the court's instructions. Based on these assurances,

the trial court committed no plain error in overruling the challenge for bias against juror No. 139.

{¶ 75} Prospective juror No. 28 expressed uncertainty about her ability to remain impartial and set aside what she knew from media exposure and talking to others about the case. Despite these misgivings, no plain error occurred in denying this challenge because prospective juror No. 28 was later excused because of her inability to view gruesome photographs.

{¶ 76} **3. Juror who heard the gunshots**. Finally, Trimble claims that the trial court erred by denying the defense challenge for cause against seated juror No. 81, who heard the gunshots on the night of the murders.

{¶ 77} During voir dire, juror No. 81 mentioned that she lived less than a mile from Ranfield Road and heard gunshots on the night of the murders. She explained, "I could hear it going on. I thought it was fireworks going on, then I found out he was shooting * * *." Under further questioning, juror No. 81 stated that she could set aside what she knew about the case and what she had heard that night and remain fair and impartial. Defense counsel challenged juror No. 81 on the grounds that she had personal knowledge of the facts and was a witness to events of this case. The trial court denied this challenge.

{¶ 78} R.C. 2945.25 provides:

{¶ 79} "A person called as a juror in a criminal case may be challenged for the following causes:

{¶ 80} "* * *

{¶ 81} "(G) That he has been subpoenaed in good faith as a witness in the case;

{¶ 82} "* * *

{¶ 83} "(O) That he otherwise is unsuitable for any other cause to serve as a juror.

{¶ 84} "* * *

**{¶ 85}** "The validity of each challenge listed in this section shall be determined by the court."

**{¶ 86}** The defense was not entitled to challenge seated Juror No. 81 under R.C. 2945.25. Seated juror No. 81 was not subpoenaed as a witness. Moreover, hearing the gunshots on the night of the murders did not make her unsuitable as a juror. The fact that gunshots were fired outside Positano's residence was never in dispute. Thus, this juror's awareness of the gunshots had no bearing on the outcome of the case. The trial court was also entitled to accept this juror's assurances that she would be fair and impartial and decide the case based on the evidence. See *State v. Gross*, 97 Ohio St.3d 121, 2002-Ohio-5524, 776 N.E.2d 1061, ¶ 38. Accordingly, no plain error was committed in the denial of the defense challenge against seated juror No. 81.

**{¶ 87}** Based on the foregoing, we overrule proposition II.

**{¶ 88}** *Excusal of death-scrupled juror*. In proposition of law III, Trimble argues that the trial court erred by excusing for cause a prospective juror who could have set aside his opposition to capital punishment and voted to impose the death penalty.

**{¶ 89}** A prospective juror may be excused for cause if his views on capital punishment "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath." *Adams v. Texas* (1980), 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581; *State v. Bethel*, 110 Ohio St.3d 416, 2006-Ohio-4853, 854 N.E.2d 150, ¶ 118. A trial court's ruling on a challenge for cause will not be disturbed on appeal absent an abuse of discretion. *State v. Wilson*, 29 Ohio St.2d at 211, 58 O.O.2d 409, 280 N.E.2d 915.

**{¶ 90}** Trimble objects to the trial court's excusal of prospective juror No. 166 because of his opposition to the death penalty. However, Trimble could not have suffered any prejudice by this prospective juror's excusal, because the jury

was seated before prospective juror No. 166 could have been selected as a member of the jury. Accordingly, we reject proposition III.

{¶ 91} *Limitations on voir dire*. In proposition of law IV, Trimble argues that the trial court erred by limiting voir dire questioning by the defense about mitigating evidence.

{¶ 92} R.C. 2945.27 and Crim.R. 24(B) require that counsel be afforded an opportunity to voir dire prospective jurors or supplement the court's voir dire examination. Nevertheless, the length and scope of voir dire fall within a trial court's sound discretion and vary depending on the circumstances of a given case. *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 40.

{¶ 93} Trimble complains that the defense was not permitted to elicit information about mitigating factors from prospective juror No. 201. However, Trimble could not have suffered any prejudice because prospective juror No. 201 was excused for medical reasons before the jury was impaneled.

{¶ 94} Additionally, Trimble claims that the trial court refused to permit defense counsel to address mitigating factors with other prospective jurors. However, Trimble fails to identify any other prospective jurors whose voir dire was curtailed or to provide examples of improper questioning.

{¶ 95} Based on the foregoing, we reject proposition IV.

{¶ 96} *Failure to exhaust peremptory challenges*. In proposition of law V, Trimble argues that his counsel provided ineffective assistance by failing to exhaust all of his peremptory challenges.

{¶ 97} The defense did not exercise one of its six peremptory challenges. Trimble claims that his counsel provided ineffective assistance by failing to use this peremptory challenge against seated juror No. 81 or No. 104 after the defense had unsuccessfully challenged them both for cause. He claims that this failure resulted in jurors sitting on his case who were predisposed to find him guilty or who would automatically vote for death.

{¶ 98} Reversal of a conviction for ineffective assistance of counsel requires that the defendant show that counsel's performance was deficient and that the deficient performance prejudiced the defendant so as to deprive him of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674. Accord *State v. Bradley* (1989), 42 Ohio St.3d 136, 538 N.E.2d 373, paragraph two of the syllabus.

{¶ 99} Decisions on the exercise of peremptory challenges are a part of trial strategy. *State v. Goodwin* (1999), 84 Ohio St.3d 331, 341, 703 N.E.2d 1251. Trial counsel, who observe the jurors firsthand, are in a much better position to determine whether a prospective juror should be peremptorily challenged. See *State v. Keith* (1997), 79 Ohio St.3d 514, 521, 684 N.E.2d 47. Trimble has failed to establish that his counsel were deficient or that he was prejudiced by the failure to challenge juror No. 81 or No. 104. Both jurors stated that they would be able to base their decisions solely on the evidence presented in court and could fairly and impartially decide the case. Because neither juror indicated any bias or prejudice, Trimble has not shown that having the two jurors hear his case denied him a fair trial. See *State v. Lindsey* (2000), 87 Ohio St.3d 479, 490, 721 N.E.2d 995; *State v. Davis* (1991), 62 Ohio St.3d 326, 350, 581 N.E.2d 1362 (counsel not ineffective by failing to use peremptory challenges when prospective jurors indicate they can set aside their personal views about the death penalty and apply the law to the facts of the case).

{¶ 100} Based on the foregoing, we overrule proposition V.

### *Trial issues*

{¶ 101} *Admission of firearms not used in murders.* In proposition of law VI, Trimble argues that the trial court erred by admitting firearms that were not used in the killings.

{¶ 102} The trial court granted a pretrial defense motion to sever Count 22, the weapons-under-disability charge. The trial court also ruled that "all

weapons mentioned in that [charge] may be admissible in the case in chief." Count 22 specified 21 different firearms, including the two firearms used in the murders, and an additional 19 firearms that were found in Trimble's basement.

{¶ 103} During the state's case-in-chief, Agent Saraya testified that he found 19 firearms in a gun safe and at other locations in Trimble's basement. Trial counsel objected to the admissibility of these firearms as irrelevant evidence, but the trial court overruled this objection and admitted them.

{¶ 104} The admission of the firearms found in the basement rested upon a question of relevancy. Evid.R. 401 provides: " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. See *State v. Sage* (1987), 31 Ohio St.3d 173, 31 OBR 375, 510 N.E.2d 343, paragraph two of the syllabus.

{¶ 105} Trimble argues that the firearms found in the basement were not relevant because none of them were used in the killings. However, the state contends that the firearms in the basement were relevant in proving that Trimble murdered Renee with prior calculation and design as charged in Count 13. The state argues that the evidence demonstrated that Trimble had formed a specific plan to murder her, because Trimble had gone to the basement, opened the gun safe, and selected the AR-15 from his collection of firearms before he killed Renee.

{¶ 106} We reject this argument because the weapon used to kill Renee was unmistakably identified and admitted into evidence. The other firearms were not used in Renee's murder and thus had no relevance to prove that Trimble murdered her with prior calculation and design.

**{¶ 107}** The state also argues that the firearms found in the basement were admissible to show his access to and familiarity with the use of firearms. The state cites *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, in arguing that the firearms in the basement were admissible in showing his ready access to them. In *Drummond*, a 9 mm handgun and various ammunition found at the defendant's residence were admitted into evidence because the handgun and the ammunition were of the type used to commit the murder. Id. at ¶ 84. However, *Drummond* does not apply to the facts in this case because the two murder weapons were seized when Trimble was arrested, and there was no link between the other weapons found in Trimble's basement and the murders.

**{¶ 108}** The state also cites *State v. Hartman* (2001), 93 Ohio St.3d 274, 754 N.E.2d 1150, for the proposition that the firearms in the basement were admissible in showing Trimble's familiarity with using the weapons. In *Hartman*, a set of knives belonging to the defendant was admitted into evidence because he owned the knives and, as a chef, was familiar with using them, a fact that made the knives relevant to the surgically precise manner with which he had cut off the victim's hands. Id. at 281-282. Unlike the facts in *Hartman*, the guns found in Trimble's basement had no relevance in proving any unique type of wounds or manner of death.

**{¶ 109}** Although not mentioned in the appellee's brief, the state argued at trial that the firearms were admissible to rebut claims of the defense that Trimble had accidentally killed Positano. During the opening statement for Trimble, trial counsel averred that Trimble had been startled when he saw police officers entering the residence. Trial counsel claimed that Trimble had accidentally shot Positano when he let go of the handgun in order to put both hands on his rifle, and the pistol discharged, killing her. Based upon these claims, the state asserted that the large number of firearms in Trimble's basement showed

his familiarity with firearms and were relevant to rebut the defense theory that Positano had been shot by accident.

{¶ 110}  This argument has some merit.  Trimble's possession of a large number of firearms tended to show that he was familiar with using such weapons. Thus, the state was entitled to use such evidence and present such arguments in rebutting defense claims that Trimble had accidentally shot Positano.  See *State v. Kamel* (1984), 12 Ohio St.3d 306, 312, 12 OBR 378, 466 N.E.2d 860 (after the defense first raised the subject of defendant's drug problem, "the topic became open to all relevant inquiry in the discretion of the trial court").  Accordingly, we find that the trial court did not abuse its discretion by admitting the firearms found in the basement.

{¶ 111}  Even assuming that the firearms should not have been admitted, any error was harmless.  Crim.R. 52(A).  Overwhelming evidence established Trimble's guilt.  Such evidence included his admissions of guilt to two family members and Sheriff Kaley, a wealth of forensic evidence tying Trimble to the murders, and eyewitness testimony.  Moreover, the jury did not impose the death penalty based upon the fact that Trimble owned many firearms.  Indeed, the firearms found in the basement were not readmitted into evidence during the penalty phase.

{¶ 112}  Based on the foregoing, we reject proposition VI.

{¶ 113}  *Display of firearms and the trial court's warning about graphic photos*.  In proposition of law VII, Trimble argues that the courtroom display of firearms and ammunition that were not used in the killings was unduly prejudicial.  He also argues that the trial court's warnings to spectators that graphic photographs of the victims were about to be shown denied him a fair trial.

{¶ 114}  **1. Display of firearms**.  During the testimony of Agent Saraya, the defense objected to the display of the firearms found in Trimble's basement as they were being identified and introduced into evidence.  The trial court overruled

this objection. After the admission of the firearms into evidence, the defense renewed its objection to the display. Trial counsel noted that the firearms were "lined up sequentially for display" upon two long cafeteria tables and that the jurors were so close to the firearms that they could reach over the jury rail and touch them. The trial court overruled the objection to the display but said, "We're going to put them away." Following a lunch break, the prosecutor stated that the firearms and ammunition had been removed from the courtroom.

{¶ 115} Later, over defense objection, the trial court allowed all of the firearms to be in the jury room during the guilt-phase deliberations. However, during the penalty phase of the trial, the trial court excluded the firearms and ammunition that had been found in Trimble's basement.

{¶ 116} The firearms and ammunition displayed in court had been introduced into evidence and were displayed only during Saraya's testimony. Nothing in the record demonstrates that the method of presenting this evidence prejudiced Trimble by inflaming the jury's passions. However, the firearms were also allowed into the jury room during the guilt-phase deliberations. While it is highly questionable whether the trial court should have allowed this evidence to be displayed before the jury in court or during deliberations, the trial court did not abuse its discretion in doing so.

{¶ 117} Even assuming that these exhibits should not have been displayed, any error was harmless. As previously discussed, overwhelming evidence was presented at trial that established Trimble's guilt of the three murders. Moreover, during the penalty phase, the trial court excluded the firearms found in the basement, and that exclusion diminishes but does not eliminate the risk of prejudice during this phase of the trial.

{¶ 118} 2. **Trial court's warning about graphic photos**. In a pretrial motion, the defense requested that any friends and family members of the victims be excluded from the courtroom during the presentation of autopsy and crime-

scene photographs and the playing of Positano's 911 tapes. The defense argued that such evidence was likely to evoke an emotional outburst that might prejudice the jury. The defense asserted that friends and family members could watch the proceedings on closed-circuit television in another room. The trial court denied this motion.

{¶ 119} During the state's case-in-chief, a photograph of Renee's and Dakota's bodies lying on the bedroom floor was shown on an overhead screen. A spectator exclaimed, "Oh, Dakota" and cried. Following this outburst, trial counsel requested a mistrial, which the trial court denied.

{¶ 120} Immediately after the outburst, the trial court advised the jury:

{¶ 121} "Ladies and gentleman, as we told you in voir dire there will be some graphic photographs and testimony that will be hard for all people to hear. You are instructed that you are to listen to the evidence as it comes from the witness stand, and the exhibits admitted throughout the trial and ignore any reaction that would happen in the spectator's area. It is important that you not be influenced by this at all. Again, listen and watch the pictures as you see them here in Court."

{¶ 122} The trial court also advised the spectators in the courtroom:

{¶ 123} "The Court would instruct the spectators from here on out I did not know there were any family members in the background, if there are, we'll take a break to give you a chance to leave. If you do not wish to look at the pictures we'll tell you that beforehand. I was unaware that was going to go up that quick.

{¶ 124} "So, again, you're instructed. I'll try to give you a break; if you wish to leave the courtroom you can. The jury is instructed to disregard any reaction from the spectators."

{¶ 125} On several occasions during the remainder of the state's case, the trial court and the prosecutor advised the spectators that photographs of the

26

victims were about to be shown in court. The spectators were also warned before Positano's 911 tape was played. The record shows that there were no further outbursts during the trial.

{¶ 126} When an emotional outburst takes place in court, the issue is whether the outburst "deprived the defendant of a fair trial by improperly influencing the jury." *State v. Scott*, 101 Ohio St.3d 31, 2004-Ohio-10, 800 N.E.2d 1133, ¶ 44. This "is a factual question to be resolved by the trial court, whose determination will not be overturned absent clear, affirmative evidence of error." *State v. White* (1999), 85 Ohio St.3d 433, 440, 709 N.E.2d 140, citing *State v. Morales* (1987), 32 Ohio St.3d 252, 255, 513 N.E.2d 267.

{¶ 127} Nothing in the record shows that the outburst had any effect on the jury. Additionally, the trial court's admonitions focused the jury on the evidence and away from the outburst. Accordingly, the trial court did not abuse its discretion in denying the defense motion for a mistrial.

{¶ 128} A trial judge has authority and discretion to exercise control over the proceedings. The trial court's decision to advise spectators that graphic photos were about to be shown was a proper measure to ensure that there were no further outbursts in court. The trial court's action constituted a reasonable alternative to requiring spectators who were friends and family members of the victims to leave the courtroom during the presentation of such evidence. See *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 52, citing *Waller v. Georgia* (1984), 467 U.S. 39, 48, 104 S.Ct. 2210, 81 L.Ed.2d 31 (a trial court must consider reasonable alternatives to closing a courtroom).

{¶ 129} Nevertheless, Trimble contends that he was prejudiced by the trial court's comments about the gruesomeness of the photographs. These claims are speculative. The trial court advised prospective jurors during voir dire that they would see "pictures that are graphic" and that they "may see reactions from the spectators" during the trial. Thus, the trial court diminished the potential for

prejudice through its earlier advisement about the graphic nature of the photographs that the jurors would view.

{¶ 130} In summary, we conclude that Trimble was not prejudiced by the display of firearms in court or the trial court's admonitions about graphic photographs before they were shown in court. Accordingly, we reject proposition VII.

{¶ 131} *Gruesome and cumulative photographs and video*. In proposition of law VIII, Trimble argues that the trial court erred by admitting gruesome and cumulative photographs and videos of the crime scene and gruesome and cumulative autopsy photographs of the three victims.

{¶ 132} The defense made a motion in limine objecting to gruesome crime-scene and autopsy photographs. However, the motion in limine did not preserve this issue. *Gable v. Gates Mills*, 103 Ohio St.3d 449, 2004-Ohio-5719, 816 N.E.2d 1049, ¶ 34. At trial, the defense objected to some, but not all, of the crime-scene and autopsy photographs. Trial counsel's failure to object at trial to photographs that he now claims are gruesome has waived all but plain error with respect to those exhibits. *State v. Twyford* (2002), 94 Ohio St.3d 340, 358, 763 N.E.2d 122.

{¶ 133} In capital cases, nonrepetitive photographs, even if gruesome, are admissible as long as the probative value of each photograph substantially outweighs the danger of material prejudice to the accused. *State v. Morales*, 32 Ohio St.3d at 257, 513 N.E.2d 267; *State v. Maurer* (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus. Decisions on the admissibility of photographs are "left to the sound discretion of the trial court." *State v. Slagle* (1992), 65 Ohio St.3d 597, 601, 605 N.E.2d 916.

{¶ 134} **1. Crime-scene photos and videotape**. Trimble complains that the trial court erred in admitting 12 crime-scene photographs and a videotape showing the victims' bodies at Trimble's home. State's exhibit 22 is a close-up

photograph showing the gunshot wound on the back of Renee's head. State's exhibit 59 is a photograph depicting bloody wounds on Dakota's neck and facial area. Both exhibits, although gruesome, were probative of Trimble's intent and the manner and circumstances of the victims' deaths. See *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 92; *State v. Jackson*, 107 Ohio St.3d 53, 2005-Ohio-5981, 836 N.E.2d 1173, ¶ 85.

{¶ 135} State's exhibits 13, 19, and 23 present three different views of Renee's and Dakota's bodies as they were found lying on the bedroom floor after the murders. These photographs were relevant to show the position of the victims' bodies at the scene. State's exhibits 32, 33, and 34 depict the lower portion of Renee's and Dakota's bodies. These photographs are not particularly gruesome and were relevant in showing the proximity of empty shell casings to the site at which the victims were shot.

{¶ 136} State's exhibit 17 is a crime-scene videotape and shows the inside of Trimble's home, the basement area, and the master bedroom both before and after the bodies were removed. Portions of the videotape are repetitive of the crime-scene photos. However, the photographs and the videotape helped to prove the killer's intent and illustrated the testimony of the detectives who described the crime scene. See *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 97. These photographs and videotape also gave the jury an "appreciation of the nature and circumstances of the crimes." *State v. Evans* (1992), 63 Ohio St.3d 231, 251, 586 N.E.2d 1042.

{¶ 137} Trimble also complains about three gruesome photographs that were not objected to at trial. State's exhibit 65 shows Renee's body on the floor after Dakota's body was removed from the bedroom. No plain error occurred in admitting this photograph because it showed three additional cartridge cases found underneath Dakota's body. State's exhibit 21 shows Dakota's knee sticking up behind the bed in the master bedroom. State's exhibit 24 shows an

empty shell casing and small bone fragments on the floor near Renee's arm. We also find no plain error in admitting these two photographs because they were not gruesome.

{¶ 138} Additionally, Trimble claims that the trial court erred in admitting State's exhibit 44, which is an empty cartridge case. However, this exhibit is not gruesome.

{¶ 139} Trimble also contends that the trial court erred in admitting four photographs from Positano's residence, but fails to explain how they are gruesome or cumulative. State's exhibits 183 and 186 depict the AR-15 assault rifle found inside her bedroom. State's exhibit 187 is a close-up of the AR-15, showing that it was jammed. State's exhibit 209 shows the 9 mm handgun that was found between the commode and the bathtub in the bathroom. However, Trimble failed to object to the admission of any of these photographs at trial. The trial court committed no plain error in admitting these photographs because each of them was relevant in illustrating Saraya's testimony.

{¶ 140} We conclude that the trial court did not err by admitting any of the crime-scene photographs or videotapes. The trial court could have reasonably concluded that the probative value of each of the photographs and the playing of the videotape outweighed any prejudicial impact on the jury. While some of the photos and videotape were repetitive, Trimble was not materially prejudiced by their admission.

{¶ 141} **2. Dakota's autopsy photos**. Trimble argues that the trial court erred by admitting the autopsy photographs of Dakota, state's exhibits 279 through 299.

{¶ 142} State's exhibit 279 depicts Dakota's fully clothed body before the autopsy. This full body view shows that Dakota suffered wounds to the neck and chest areas. State's exhibits 282, 283, and 284 present close-ups and different angles of Dakota's face showing gunshot wounds to his neck, chin, and other

facial areas. State's exhibit 295 is a close-up of the neck wound. These different photographs illustrated that Dakota suffered atypical entrance wounds on his face and neck and demonstrated that gunshots struck Renee before hitting Dakota.

{¶ 143} State's exhibit 285 is a photograph of Dakota's torso showing that he suffered two gunshot wounds to the chest. State's exhibit 287 is a photo of the back of Dakota's neck showing the location of two exit wounds. These exhibits also supported the medical examiner's testimony about Dakota's injuries.

{¶ 144} Other autopsy photographs depict injuries to Dakota's arms and his right hand. State's exhibits 288, 289, and 290 are photos of wounds that Dakota suffered to his right hand and arm. State's exhibits 291 and 292 are entrance wounds near Dakota's left wrist and are not gruesome. State's exhibits 293 and 294 are somewhat gruesome and depict exit wounds on his left wrist. The exit wound's "irregular lacerated appearance" helped show the amount of tissue damage caused by a high-velocity projectile.

{¶ 145} Trimble also complains about other autopsy photos that were not objected to at trial. However, no plain error was committed in admitting these exhibits. State's exhibit 296 is not gruesome and shows superficial abrasions near Dakota's temple. State's exhibits 280 and 281 show a bullet recovered from Dakota's clothing and are not gruesome photographs. See *State v. Moreland* (1990), 50 Ohio St.3d 58, 64, 552 N.E.2d 894 (photos merely depicting bullets and spent bullet casings are not "gruesome"). Finally, state's exhibits 297, 298, and 299 are x-rays of Dakota's head, chest, and forearm and are not gruesome. See *State v. Williams* (Mar. 20, 2000), Mahoning App. No. 98 CA 74, 2000 WL 309390, *11 (photographs of x-rays showing where the coroner recovered slugs were not gruesome, shocking, or prejudicial).

{¶ 146} **3. Renee's autopsy photos**. Trimble claims that the trial court also erred by admitting the autopsy photographs of Renee Bauer, state's exhibits 248 thru 277.

{¶ 147} State's exhibit 248 shows Renee's fully clothed body before the autopsy. This photo showed extensive wounds to her head and chest area. State's exhibits 250 and 251 are decidedly gruesome photographs showing Renee's head split open from one of the bullets. State's exhibit 252 is a photograph showing that the bullet struck Renee in the front of her head. The photos showed that Renee had turned her head towards Trimble when she was shot. Each of these photos depicted the destructive nature of Renee's head wounds and helped to prove Trimble's intent. See *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 73.

{¶ 148} Dr. Sterbenz testified that Renee was shot 13 times. State's exhibit 249 shows gunshot wounds to Renee's back, buttocks, and the back of her head. State's exhibit 253, which was admitted without defense objection, provides a closer view of the wounds to Renee's back and buttocks. State's exhibit 254 is a close-up of a bullet wound to Renee's right shoulder, and state's exhibit 255 is a close-up of exit wounds near the base of her neck. State's exhibit 256 shows numerous exit wounds on the front of Renee's torso. State's exhibit 257 is the same photograph with arrows showing the location of these wounds. Although gruesome, each of these photographs supported the medical examiner's testimony and provided an overall perspective of her wounds. See *State v. Craig*, 110 Ohio St.3d 306, 2006-Ohio-4571, 853 N.E.2d 621, ¶ 94.

{¶ 149} State's exhibits 258, 259, 260, and 261 show four different views of a bullet wound to Renee's right hand and thumb. These photographs are not particularly gruesome and were relevant in showing the extent of all of Renee's injuries. However, these photographs were unduly cumulative. Nevertheless, any error was harmless because there is little danger that the jury was prejudiced by viewing repetitive photographs of Renee's hand wounds.

{¶ 150} State's exhibit 264 shows a bruise on Renee's right upper thigh. State's exhibits 262, 263, and 265, which were admitted without defense

objection, depict bruises on Renee's leg, left upper thigh, and right arm. Dr. Sterbenz testified that each of these bruises resulted from blunt-force injuries occurring before Renee was murdered. None of these photographs are gruesome. Moreover, each photograph was probative of Trimble's intent by showing the likelihood that he struck Renee several days before killing her.

{¶ 151} Finally, Trimble complains about state's exhibits 266 through 271, photos of bullet fragments removed during Renee's autopsy, and state's exhibits 272 through 277, photos of x-rays taken during the autopsy. However, Trimble failed to object to the admission of these exhibits at trial. We find that there was no plain error in admitting these photos because none of them are gruesome.

{¶ 152} **4. Positano's autopsy photos**. Trimble also argues that the trial court erred by admitting state's exhibits 315 through 327, the autopsy photos of Positano.

{¶ 153} State's exhibit 315 shows the top half of Positano's fully clothed body before the autopsy. This photograph depicts the neck wound that Positano suffered. State's exhibit 316, which was admitted without defense objection, is not gruesome and shows the bottom portion of Positano's clothed body. State's exhibits 317 and 318 present two views of Positano's fleece jacket that she was wearing when she was shot. These two photos were relevant in showing the bullet hole and gunshot residue on the collar of the jacket, which helped establish the proximity of the gun to Positano when it was fired.

{¶ 154} State's exhibits 319 and 320 present different views of the entry wound on Positano's neck. State's exhibits 321 and 322 are different views of the exit wound on the left side of Positano's torso. State's exhibit 323 is a close-up photograph showing the edges of the wound being pinched "back together"; the photograph helped to illustrate Dr. Dean's testimony that this was the exit wound. State's exhibit 324 shows a metal probe inside of Positano's neck where the bullet

damaged her carotid artery. State's exhibit 325 shows damage to the left lung and blood in the chest cavity caused by the gunshot wound. Each of these photographs was relevant in supporting Dr. Dean's conclusion that "Miss Positano died from a gunshot wound to the neck with perforation of her carotid artery and left lung." State's exhibit 326 shows Positano's back and depicts the extent of livor mortis. State's exhibit 327 is a photograph of an x-ray of Positano's chest cavity and shows that there were no projectiles inside her body. We find that neither photograph is gruesome; nor was any error committed in admitting them.

{¶ 155} In summary, we conclude that the trial court committed no error, plain or otherwise, in admitting any of the autopsy photos of Dakota, Renee, or Positano. The photographs illustrated the testimony of Dr. Sterbenz and Dr. Dean, demonstrated Trimble's specific intent to kill, and had substantial probative value and relevance. See *State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 90.

{¶ 156} Based on the foregoing, we overrule proposition VIII.

{¶ 157} *Testimony about prior conviction*. In proposition of law IX, Trimble argues that the trial court erred by failing to declare a mistrial after one of the state's witnesses mentioned that Trimble had a prior conviction.

{¶ 158} During the defense cross-examination of Agent Saraya, the following colloquy took place:

{¶ 159} "Q: Now, Agent Saraya, during your direct examination the prosecutor brought out several firearms which he had you identify and then they were displayed on two cafeteria tables in front of the jury box, do you recall that?

{¶ 160} "A: Yes, sir.

{¶ 161} "Q: I would like to refer to those firearms. State's exhibit 109, which you identified as a Beretta .22 caliber pistol, do you recall that?

{¶ 162} "A: Yes, sir.

34

**{¶ 163}** "Q: Okay. Would you explain to the jury how that firearm figured into the shootings in this case?

**{¶ 164}** "Mr. Vigluicci (the prosecutor): Objection, relevance.

**{¶ 165}** "The Court: Overruled. You brought them out. Go ahead.

**{¶ 166}** "A: During the processing of the Ranfield Road address, after Mr. Trimble had been taken into custody, it was found that he had other weapons at home and *having a prior conviction —*

**{¶ 167}** "Mr. Lager (trial counsel): Objection.

**{¶ 168}** "Mr. Vigluicci: Objection.

**{¶ 169}** "The Court: Sustained. Jury is instructed to disregard." (Emphasis added.)

**{¶ 170}** Following this exchange, trial counsel moved for a mistrial. The trial court ruled that it "has instructed the jury to disregard and sustains the objection, therefore, the motion for mistrial is overruled."

**{¶ 171}** Under Evid.R. 404(B), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."

**{¶ 172}** It is well settled that evidence of prior convictions is prohibited except under narrow circumstances. See *State v. Allen* (1987), 29 Ohio St.3d 53, 55, 29 OBR 436, 506 N.E.2d 199. Here, trial counsel never inquired about any prior convictions or asked any other questions that opened the door to Saraya's response. See *State v. Ganelli*, Cuyahoga App. Nos. 84694, and 84695, 2005-Ohio-770, ¶ 20-21 (defense questions about the existence of corroborating evidence did not open the door to testimony about the defendant's two prior convictions). Thus, Saraya's mention of Trimble's prior conviction was improper and violated Evid.R. 404(B).

**{¶ 173}** Trimble argues that the trial court erred by failing to grant his motion for mistrial because he was prejudiced by the disclosure of his prior

conviction. The grant or denial of a mistrial lies within the sound discretion of the trial court. However, a trial court need not declare a mistrial unless "the ends of justice so require and a fair trial is no longer possible." *State v. Franklin* (1991), 62 Ohio St.3d 118, 127, 580 N.E.2d 1.

{¶ 174} The state cites *State v. Garner* (1995), 74 Ohio St.3d 49, 656 N.E.2d 623, in arguing that the trial court did not err by overruling the motion for mistrial. In *Garner*, the defendant objected and moved for a mistrial after a police investigator testified that he had made arrests at the defendant's address in the past. Id. at 59. The trial court immediately sustained the defense objection to such testimony and instructed the jury not to consider it. We affirmed the trial court's denial of a mistrial, because "the reference to the defendant's prior arrests was fleeting and was promptly followed by a curative instruction." Id.

{¶ 175} In this case, as in *Garner*, the reference to Trimble's prior conviction was a brief and isolated remark that was followed by a curative instruction. The mere mention of Trimble's conviction, without more, did not unfairly prejudice Trimble so as to require a mistrial. Moreover, there is no likelihood that Trimble was prejudiced by the mention of his prior conviction because of the overwhelming evidence establishing his guilt. See *State v. Treesh*, 90 Ohio St.3d at 483, 739 N.E.2d 749. Based on the foregoing, we reject proposition IX.

{¶ 176} *"Other acts" testimony*. In proposition of law X, Trimble argues that the trial court erred by admitting testimony that he had made derogatory comments about Renee and had fought with her at a party, and by allowing a neighbor to testify about guns that Trimble kept at his home.

{¶ 177} Trimble argues that this "other acts" testimony was not relevant and not admissible under Evid.R. 404(B). However, the record shows that most of trial counsel objections were phrased in terms of leading questions, mischaracterization of the testimony, and questions that had been asked and

answered. These objections were unrelated to "other acts" testimony and were insufficient to preserve this error. Thus, except where noted, trial counsel has waived all but plain error. *State v. Childs* (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.

{¶ 178} **1. Derogatory comments about Renee**. During the state's case-in-chief, Darrell French testified that he and his wife had introduced Renee to Trimble. Darrell stated that their relationship was "great" for a while, and then "[i]t got real bad." Darrell stated that Trimble started complaining about Renee and referred to her as "the fucking bitch this, the fucking bitch that." Testimony concerning Trimble's complaints about Renee and his unhappiness with their relationship was relevant in establishing Trimble's motive and intent and was allowed under Evid.R. 404(B). No plain error was committed in admitting this testimony.

{¶ 179} **2. Argument with Renee and shooting guns**. Darrell testified that in October 2004, Trimble and Renee attended a party at French's home. Trimble and Renee had an argument at the party, and Renee left. Trimble remained at the party, became drunk, and complained about Renee. Before leaving the party, Trimble stated that he was "in a mood to go home and blow something up." Darrell testified, over defense objection, that later that evening, he heard gunshots being fired in the woods behind Trimble's home.

{¶ 180} Testimony that Trimble had had an argument with Renee and later talked about going home and blowing something up was relevant in proving Trimble's motive and intent under Evid.R. 404(B). Darrell's testimony about hearing gunshots in the woods following Trimble's argument with Renee showed that Trimble reacted to arguments with his wife by shooting his guns. Such testimony was also relevant in proving motive and intent under Evid.R. 404(B). Thus, the trial court did not abuse its discretion in admitting this testimony.

{¶ 181} **3. Guns in Trimble's home**.  Darrell testified that he visited Trimble's home shortly after Trimble moved in.  During this visit, Trimble showed him 20 or 30 guns that he had in a bedroom, including pistols and assault rifles and the ammunition for them.  Trimble talked a lot about his guns and explained what each of them was.  Trimble later told Darrell that he knew how to make different parts for guns and could make automatic weapons from regular weapons.

{¶ 182} The admission of this testimony rested upon a question of relevancy under Evid.R. 401.  Here, the testimony showed Trimble's familiarity with using firearms and ammunition.  As discussed in proposition VI, evidence showing Trimble's familiarity with firearms was relevant in rebutting defense claims that Trimble had accidentally shot Positano when the gun slipped out of his hand.  Thus, we find no plain error in admitting such testimony.

{¶ 183} **4. Limiting instructions**.  Trimble complains that it is "not clear" that the trial court provided the jury with limiting instructions concerning Darrell's testimony.  The record shows that none was provided.  However, the defense never requested such an instruction and waived all but plain error.  *State v. Grant* (1993), 67 Ohio St.3d 465, 472, 620 N.E.2d 50.  Nothing in the record suggests that the jury used "other acts" evidence to convict Trimble because he was a bad person.  Accordingly, the failure to give such instructions did not constitute plain error.  See *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 91.  Based on the foregoing, we reject proposition X.

{¶ 184} *Failure to instruct on reckless homicide*.  In proposition of law XI, Trimble argues that the trial court erred by failing to instruct the jury on the lesser included offense of reckless homicide as to Count 15, which charged the aggravated murder of Positano during a kidnapping, aggravated burglary, or burglary.

38

{¶ 185} The trial court instructed the jury on involuntary manslaughter as a lesser included offense for Positano's death in Count 15. However, the trial court refused the defense request to instruct the jury on reckless homicide as a lesser included offense of that charge.

{¶ 186} In determining whether an instruction on reckless homicide was required, it must first be determined whether reckless homicide is a lesser included offense of felony murder. "An offense may be a lesser *included* offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense." (Emphasis sic.) *State v. Deem* (1988), 40 Ohio St.3d 205, 209, 533 N.E.2d 294.

{¶ 187} The elements of felony murder charged in Count 15 and the offense of reckless homicide are as follows:

{¶ 188} R.C. 2903.01(B), the aggravated felony murder statute, provides: "No person shall purposely cause the death of another * * * while committing or attempting to commit, or while fleeing immediately after committing or attempting to commit, kidnapping, rape, aggravated arson, arson, aggravated robbery, robbery, aggravated burglary, burglary, terrorism, or escape." R.C. 2901.22(A) states, "A person acts purposely when it is his specific intention to cause a certain result * * *."

{¶ 189} R.C. 2903.041, the reckless homicide statute, provides: "(A) No person shall recklessly cause the death of another * * *." A definition of "recklessly" appears in R.C. 2901.22(C): "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature."

**{¶ 190}** Application of the *Deem* test shows that reckless homicide is a lesser included offense of aggravated felony murder. The first prong of the *Deem* test is met because reckless homicide is a felony of the third degree, which carries a lesser penalty than felony murder. The second prong is met because a defendant cannot cause the death of a person under R.C. 2903.01(B) without also causing the death of that person under R.C. 2903.041. In purposely causing the death of another, one has to first become reckless in causing the death of another. Finally, the third prong is met because committing reckless homicide does not require the "committing or attempting to commit" another felony. R.C. 2903.01(B).

**{¶ 191}** District courts of appeals have also held that reckless homicide is a lesser included offense of felony murder. See *State v. Anderson*, Butler App. No. CA2005-06-156, 2006-Ohio-2714, ¶ 9 (reckless homicide as a lesser included offense of aggravated felony murder charged under R.C. 2903.01(B)); *State v. Alston*, Lorain App. No. 05CA008769, 2006-Ohio-4152, ¶ 48 (reckless homicide as a lesser included offense of felony murder charged under R.C. 2903.02(B)).

**{¶ 192}** Even though an offense may be a lesser included offense, a charge on the lesser offense is required "only where the evidence presented at trial would reasonably support both an acquittal of the crime charged and a conviction upon the lesser included offense." *State v. Thomas* (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph two of the syllabus. The trial court must view the evidence in the light most favorable to the defendant when deciding whether to instruct the jury on a lesser included offense. See *State v. Campbell* (1994), 69 Ohio St.3d 38, 47-48, 630 N.E.2d 339. The lesser-included-offense instruction is not warranted every time "some evidence" is presented to support the lesser offense. *State v. Shane* (1992), 63 Ohio St.3d 630, 632, 590 N.E.2d 272. Rather, a court must find "sufficient evidence" to "allow a jury to *reasonably* reject the greater offense and find the defendant guilty on a lesser included (or inferior degree) offense." (Emphasis sic.) Id. at 632-633.

{¶ 193} Trimble contends that he was entitled to an instruction on reckless homicide because he accidentally killed Positano after being surprised by SWAT team members entering the residence. Trimble claims that this assertion is supported by his promise that he would release Positano after two hours and Dehus's expert testimony that one of the bullets fired by the SWAT team originated from inside the residence.

{¶ 194} Viewing the evidence in a light most favorable to Trimble, we find that the evidence clearly established that he purposely killed Positano. Trimble abducted Positano with a loaded firearm that he kept cocked and aimed at her head. While talking with the 911 operator and the SWAT team negotiator, Trimble repeatedly threatened to kill Positano. Trimble backed up his threats by pointing out that he had already killed two people that had "fucked" with him. Baron's testimony and the 911 tape established that Trimble killed Positano while talking to a negotiator on the phone.

{¶ 195} There was no reasonable basis for the jury to find that Trimble recklessly shot Positano after being startled by SWAT team members who had entered the residence. Robertson, the SWAT team commander, testified that none of the SWAT team had been sent into the residence as Trimble alleges. Moreover, the SWAT team timeline established that Trimble fired the first shot when he killed Positano. The evidence also established that the SWAT team members did not fire their first shots until about half an hour after Positano was killed.

{¶ 196} Trimble argues that Dehus's testimony supports the theory that SWAT team members startled him, resulting in the accidental shooting of Positano. However, Dehus's testimony is in conflict with Trimble's own statement of events to Sheriff Kaley. Trimble told Sheriff Kaley that SWAT team members entered the residence and fired three shots. However, Dehus testified that only one shot had originated from inside the residence.

{¶ 197}  Even if the refusal to instruct on reckless homicide was error, we find that it was harmless.  The jurors could have found Trimble guilty of involuntary manslaughter if they had had any doubt about Trimble's purpose to kill but were reluctant to acquit.  However, the jury chose to find Trimble guilty of aggravated felony murder.  Under these circumstances, it is unlikely that the jury would have found Trimble guilty of the even less culpable crime of reckless homicide.  See *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 139.

{¶ 198}  Based on the foregoing, we find that Trimble was not entitled to an instruction on reckless homicide.  Thus, we overrule proposition XI.

### *Penalty-phase issues*

{¶ 199}  *Prosecutorial misconduct*.  In proposition of law XII, Trimble argues that the prosecutor committed multiple instances of prosecutorial misconduct.

{¶ 200}  The test for prosecutorial misconduct is whether the remarks were improper and, if so, whether they prejudicially affected the accused's substantial rights.  *State v. Smith* (1984), 14 Ohio St.3d 13, 14, 14 OBR 317, 470 N.E.2d 883.  The touchstone of the analysis "is the fairness of the trial, not the culpability of the prosecutor."  *Smith v. Phillips* (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78.

{¶ 201}  First, Trimble argues that the state improperly cross-examined Bresley (Trimble's mother) about Trimble's prior military conviction.  During mitigation, Bresley testified about Trimble's life history, including his service in the Air Force from 1980 to 1985.  Bresley stated that she stayed in touch with Trimble when he was in the Air Force through letters and frequent phone conversations.  Bresley stated that her son kept her abreast about what he was doing in the Air Force, and "[i]t was relaxing and nice to know he was getting along okay."

{¶ 202} At the conclusion of Bresley's direct examination, the prosecutor informed the trial court of its intention to ask Bresley about Trimble's past criminal conduct because the defense had placed his character at issue. The trial court overruled the state's request by finding that the defense had not placed Trimble's character at issue.

{¶ 203} During cross-examination, the prosecutor asked Bresley about Trimble's military service:

{¶ 204} "Q: You mentioned that your son left the Air Force in 1985, is that correct?

{¶ 205} "A: Yes, sir.

{¶ 206} "Q: Were you aware that he left by court martial?

{¶ 207} "Mr. Lager (defense counsel): Objection.

{¶ 208} "A: No, sir.

{¶ 209} "The Court: Overruled on that.

{¶ 210} "Q: Were you aware he was discharged with a bad conduct discharge?

{¶ 211} "Mr. Lager: Objection.

{¶ 212} "A: No, sir.

{¶ 213} "The Court: Overruled.

{¶ 214} "Q: He never told you that?

{¶ 215} "A: No, sir.

{¶ 216} "Q: Were you aware that he was sentenced to six months hard labor?

{¶ 217} "Mr. Lager: Objection.

{¶ 218} "The Court: I'll sustain as to that, the jury is instructed to disregard.

{¶ 219} "Mr. Lager: I ask to still make a record, Judge.

{¶ 220} "The Court: You're allowed. Again, the jury is instructed to totally disregard that."

{¶ 221} Thereafter, trial counsel moved for a mistrial because of the prosecutor's misconduct in mentioning Trimble's confinement. The trial court overruled the defense motion and instructed the jury "to disregard any question or answer by the prosecutor or any witness in this matter."

{¶ 222} Trimble asserts that the prosecutor committed misconduct by questioning his mother about his military conviction because the defense had not opened the door to such evidence. The state claims that Bresley's testimony presented an incomplete picture of Trimble's Air Force career when she indicated that he voluntarily left the Air Force after his term of service was completed. The state argues that the prosecutor was allowed to rebut these incomplete statements by cross-examining Bresley about Trimble's court-martial and bad-conduct discharge.

{¶ 223} "The prosecutor, in the penalty stage of a capital trial, may rebut false or incomplete statements regarding the defendant's criminal record. This right is limited, however, to those instances where the defense offers a specific assertion, by a mitigation witness or by the defendant, that misrepresents the defendant's prior criminal history." *State v. DePew* (1988), 38 Ohio St.3d 275, 528 N.E.2d 542, paragraph three of the syllabus; see also *State v. Henness* (1997), 79 Ohio St.3d 53, 67, 679 N.E.2d 686.

{¶ 224} Bresley did not testify about Trimble's discharge or disciplinary record in the Air Force. Thus, the defense did not open the door to questions about his prior military conviction or the bad-conduct discharge and jail sentence that he received from his court-martial conviction. Such questioning was improper.

{¶ 225} Nevertheless, any error was harmless. Bresley's cross-examination about Trimble's court-martial and discharge was brief, and no details

were elicited about the underlying offense. Moreover, the trial court instructed the jury "to disregard any questions or answer by the prosecutor or any witness in this matter." See *State v. Durr* (1991), 58 Ohio St.3d 86, 95, 568 N.E.2d 674 (defendant not denied a fair trial by improper comment about his prior conviction in view of jury instructions to disregard the remarks). Because of the overwhelming evidence supporting the aggravating circumstances and the relatively unremarkable evidence offered in mitigation (discussed infra), there is little chance that the jury sentenced Trimble to death based upon the disclosure of the information about his prior military conviction and punitive discharge from the Air Force.

**{¶ 226}** Second, Trimble argues that the prosecutor improperly cross-examined Bresley about whether he had abused a former wife. During mitigation, Bresley testified that Trimble married Kelly Trimble in 1985. She testified they were married for about five years and then divorced.

**{¶ 227}** During cross-examination, the prosecutor asked Bresley about that marriage:

**{¶ 228}** "Q: Ma'am, you testified also you were aware of your son's marriage to a Kelly, is that her name?

**{¶ 229}** "A: Yes, sir.

**{¶ 230}** "Q: And were you aware under what circumstances that marriage ended?

**{¶ 231}** "A: They got a divorce, sir.

**{¶ 232}** "Q: Were you aware of any domestic violence in that?

**{¶ 233}** "A: No, sir."

**{¶ 234}** The trial court sustained a defense objection to this question and warned the prosecutor that "any further procedure in this is going to constitute a mistrial." The trial court also advised the jury to "disregard."

**{¶ 235}** The prosecutor's cross-examination of Bresley about Trimble's abuse of a former wife was irrelevant and tended to portray Trimble in a negative light. But the error was harmless in view of Bresley's negative response to the prosecutor's question. Moreover, the trial court sustained the defense objection and immediately instructed the jury to disregard the question. See *State v. Heinish* (1990), 50 Ohio St.3d 231, 241, 553 N.E.2d 1026 ("Where a jury is cautioned and a correction is given to the jury, the effect of improper evidence may be cured").

**{¶ 236}** Third, Trimble complains that the state improperly sought to pursue questions about his character during the cross-examination of Aubrey Bryce. However, Bryce was asked no such questions. Rather, the record indicates that Trimble is actually complaining about the cross-examination of Mark Brazle.

**{¶ 237}** Brazle, the minister of Trimble's church, testified about Trimble's membership in the church and his jail visits with Trimble. Following Brazle's direct examination, the prosecutor sought the court's permission to cross-examine Brazle about his knowledge of the defendant's true character. The trial court denied this request, and the prosecutor did not cross-examine this witness. Accordingly, this claim has no merit.

**{¶ 238}** Fourth, Trimble argues that the prosecutor improperly cross-examined Dr. Robert Smith, a clinical psychologist and certified addiction specialist, about irrelevant and inappropriate matters. During direct examination, Smith testified that Trimble suffered from a bipolar II disorder and alcohol and substance abuse and dependence.

**{¶ 239}** Initially, Trimble complains that the prosecutor improperly cross-examined Smith about his views on the death penalty. During cross-examination, Smith stated that he had testified 20 to 25 times as a defense witness

in capital cases and that he had never been asked to testify as a prosecution witness.  The prosecutor then asked Smith about his views on the death penalty:

{¶ 240}  "Q:  Do you have any sort of bias in terms of the death penalty, Doctor?

{¶ 241}  "A:  No.

{¶ 242}  "Q:  You don't care one way or another?

{¶ 243}  "A:  I support the death penalty, it's part of our laws.

{¶ 244}  "Q:  Do you believe it's appropriate?

{¶ 245}  "Mr. Lager (defense counsel):  Objection, asked and answered.

{¶ 246}  "The Court:  Overruled.

{¶ 247}  "A:  I don't know [if] I have an opinion about that.

{¶ 248}  "* * *

{¶ 249}  "Q:  Let me ask you this.  If there were an election tomorrow in Ohio to do away with the death penalty how would you vote?

{¶ 250}  "Mr. Lager:  Objection.

{¶ 251}  "The Court:  Overruled.

{¶ 252}  "A:  I'm not sure.  I would have to weigh all the options and know what all the information was.

{¶ 253}  "Q:  Doctor, you deal with this stuff pretty regularly, you haven't weighed the options at this point?

{¶ 254}  "A:   I thought I answered the question, I support the death penalty as it is in the laws today."

{¶ 255}  The prosecutor's cross-examination about the death penalty was proper.  The prosecutor was attempting to discredit Smith's testimony by showing that he was biased.  See *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637, ¶ 127 (cross-examination about an expert's opposition to the death penalty was properly asked to detect bias).  Moreover, Smith's testimony that he supported the death penalty bolstered his credibility as a defense witness.  Thus,

even if the cross-examination about the death penalty was improper, Trimble suffered no prejudice.

{¶ 256} Next, Trimble asserts that the state improperly cross-examined Smith about Trimble's history of domestic violence. This information was included in Smith's written report, which was not introduced into evidence. Over defense objection, Smith was asked:

{¶ 257} "Q: Let me refer you to page 18. At the bottom there where it says the third female relationship, do you see that?

{¶ 258} "A: Yes, I do.

{¶ 259} "Q: And as we talk here there is an indication that there was some violence in that relationship, is there not?

{¶ 260} "A: Yes, there is.

{¶ 261} "Q: And there is also an indication that he had some violence in a prior relationship with a Kelly Penn, is that also true? * * *

{¶ 262} "A: Yes, sir.

{¶ 263} "* * *

{¶ 264} "Q: * * * Now in terms of this relationship history, there appears to be a pretty steady pattern of violence, is that correct?

{¶ 265} "A: There was violence in the relationships, yes."

{¶ 266} Evid.R. 611(B) provides that cross-examination shall be permitted on all relevant matters and on matters affecting credibility. "The limitation of * * * cross-examination lies within the sound discretion of the trial court, viewed in relation to the particular facts of the case. Such exercise of discretion will not be disturbed in the absence of a clear showing of an abuse of discretion." *State v. Acre* (1983), 6 Ohio St.3d 140, 145, 6 OBR 197, 451 N.E.2d 802. Moreover, Evid.R. 705 permits the jury to know what facts or data form the basis for the expert's opinion.

**{¶ 267}** During direct examination, Smith testified that he completed Trimble's "life history" in preparing his report. However, Smith neither mentioned nor indicated that he considered Trimble's history of domestic violence in concluding that Trimble suffered from substance abuse and a bipolar disorder. Thus, the defense did not open the door to the cross-examination of Smith about Trimble's history of domestic violence. Compare *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 92 (cross-examination about defendant's domestic-violence convictions was proper after defense expert testified that the defendant was not violent or dangerous).

**{¶ 268}** The cross-examination of Smith about Trimble's domestic violence was irrelevant and improper. Nevertheless, this testimony did not result in prejudicial error. Smith's reference to Trimble's domestic violence was of minor significance, given the gravity of the three aggravated-murder charges that he was convicted of committing.

**{¶ 269}** Finally, Trimble argues that the prosecutor improperly cross-examined Smith about Trimble's drug screening. Over defense objection, the prosecutor questioned Smith about Trimble's ability to stop using drugs before taking a required drug screen:

**{¶ 270}** "Q: Doctor Smith, I'm referring to page ten of your report. And I'm looking at the last paragraph, bottom of the page there. Could you read that second sentence, please?

**{¶ 271}** "A: Although he underwent urine drug screens the screens were announced in advance and Mr. Trimble knew that as long as he did not use 48 hours prior to the screen he would have a negative result.

**{¶ 272}** "Q: So when we talk about this compulsive, uncontrolled use, we actually have situations here where Mr. Trimble can refrain from using in order to gain a desired test result, is that correct?

**{¶ 273}** "A: He was able to go 48 hours without using, that is correct.

{¶ 274} "Q: So in that sense, at least in those times he controlled his use of methamphetamine; he controlled the drug essentially, did he not?

{¶ 275} "A: He chose for those 48 hours not to use, that is correct.

{¶ 276} "Q: So he had the ability to choose not to use?

{¶ 277} "A: Yes."

{¶ 278} The defense opened the door to this line of questioning. During direct examination, Smith testified that he diagnosed Trimble with methamphetamine dependence. Smith explained that individuals who are drug dependent develop a "craving * * * that is equivalent to thirst and hunger and sexual drive. * * * [T]hey feel compelled to use. The craving is so great that it is very difficult for them not to use." Thus, questions about Trimble's ability to refrain from using methamphetamines before taking a drug screen were relevant in undermining Smith's conclusion that Trimble was methamphetamine dependent.

{¶ 279} Based upon the foregoing, we reject proposition XII.

### *Appropriateness of the death penalty*

{¶ 280} In proposition of law XIII, Trimble argues that his death sentence is inappropriate because the aggravating circumstances do not outweigh the mitigating factors. In this proposition, Trimble summarizes the mitigation evidence presented during the penalty phase of the trial without providing any further explanation in support of his argument. The propriety of his sentence is addressed in our independent sentence evaluation below.

### *Proportionality*

{¶ 281} In proposition of law XIV, Trimble disputes the constitutionality of Ohio's proportionality review. However, we summarily reject these arguments. See *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, 767 N.E.2d 166, ¶ 23; *State v. Steffen* (1987), 31 Ohio St.3d 111, 31 OBR 273, 509 N.E.2d 383, paragraph one of the syllabus.

*Constitutionality*

{¶ 282}  In proposition of law XV, Trimble attacks the constitutionality of Ohio's death-penalty statutes.  We have previously rejected similar claims.  See *State v. Carter* (2000), 89 Ohio St.3d 593, 606-608, 734 N.E.2d 345; *State v. Clemons* (1998), 82 Ohio St.3d 438, 454, 696 N.E.2d 1009; *State v. Jenkins* (1984), 15 Ohio St.3d 164, 15 OBR 311, 473 N.E.2d 264, paragraph one of the syllabus.

{¶ 283}  Trimble also disputes the constitutionality of lethal injection. However, we have rejected similar claims.  *State v. Frazier*, 115 Ohio St.3d 139, 2007-Ohio-5048, 873 N.E.2d 1263, ¶ 245; *State v. Adams*, 103 Ohio St.3d 508, 2004-Ohio-5845, 817 N.E.2d 29, ¶ 131.  See also *Baze v. Rees* (2008), 553 U.S. ___, 128 S.Ct. 1520, 1537-1538, 170 L.Ed.2d 420 (upholding the constitutionality of Kentucky's three-drug lethal-injection protocol, which is similar to the protocol used in Ohio).

{¶ 284}  Finally, Trimble contends that Ohio's death-penalty statutes violate international law and agreements to which the United States is a party. We also reject these arguments.  See *State v. Issa* (2001), 93 Ohio St.3d 49, 69, 752 N.E.2d 904; *State v. Bey* (1999), 85 Ohio St.3d 487, 502, 709 N.E.2d 484.

## INDEPENDENT SENTENCE EVALUATION

{¶ 285}  Having considered Trimble's propositions of law, we are required by R.C. 2929.05(A) to independently review Trimble's death sentence for appropriateness and proportionality.

{¶ 286}  *Aggravating circumstances*.  The evidence at trial established beyond a reasonable doubt that Trimble murdered Renee Bauer as part of a course of conduct involving the purposeful killing of two or more people, R.C. 2929.04(A)(5).  The evidence also established beyond a reasonable doubt that Trimble murdered Dakota Bauer as part of a course of conduct, R.C. 2929.04(A)(5), and that he purposefully killed a child under the age of 13, R.C.

2929.04(A)(9). In addition, the evidence established beyond a reasonable doubt that Trimble murdered Sarah Positano as part of a course of conduct, R.C. 2929.04(A)(5), while committing the offense of kidnapping, R.C. 2929.04(A)(7), and while committing the offense of aggravated burglary, R.C. 2929.04(A)(7). As to Positano's murder, the trial court merged the murder-to-escape-detection specification, R.C. 2929.04(A)(3) with the two R.C. 2929.04(A)(7) specifications.

{¶ 287} *Mitigating evidence*. Against these aggravating circumstances, we are called upon to weigh the mitigating factors contained in R.C. 2929.04(B). Trimble called 11 mitigation witnesses and personally made an unsworn statement.

{¶ 288} Elizabeth Bresley, Trimble's mother, testified that Trimble was born on July 20, 1960, in Akron. He has one older brother, Arthur Trimble Jr. Bresley and Arthur Trimble Sr., her husband and the defendant's father, lived and worked in the Akron area for many years. In 1972 or 1973, the family moved to 880 Sandy Lake Road. Arthur Trimble Sr. died in 1993.

{¶ 289} Trimble was a good student. Bresley testified that he made "As and Bs" throughout his schooling. Trimble spent his summers visiting his grandparents in West Virginia. Trimble loved the outdoors, and an uncle taught him many things about surviving in the woods. Trimble was on football, baseball, and track teams while growing up and was in Boy Scouts. He also attended a local Methodist Church.

{¶ 290} During his junior and senior years in high school, Trimble worked at a department store. He used the money he earned to buy a car. Trimble was dismissed from high school for six weeks for possessing marijuana. However, Trimble was allowed to return to high school and later graduated.

{¶ 291} Trimble enlisted in the Air Force after high school. He was stationed in Texas and remained in the Air Force from 1980 to 1985. Trimble remained in Texas after leaving the Air Force and worked as a maintenance

supervisor at an apartment complex in the Dallas-Fort Worth area. Trimble married Kelly Penn in 1985. They divorced five years later. During their marriage, Trimble raised Penn's daughter, who he thought was his own child. Trimble later learned that the girl was not his. Nevertheless, he maintained a relationship with the girl after the divorce. Thereafter, Trimble stayed in Texas and married Susan McCoy. They divorced in 2002 after 13 years of marriage.

{¶ 292} In August 2003, after the divorce, Trimble returned to Ohio. Shortly thereafter, Trimble began repairing the home at 880 Sandy Lake Road. In October 2003, Trimble met and started dating Renee Bauer. In November 2003, Renee rented the house and lived there with Trimble and Dakota. According to Bresley, Trimble, Renee, and Dakota were like a family, and Trimble developed a father-son relationship with Dakota.

{¶ 293} Bresley asked the jurors to spare Trimble's life. Bresley said that Trimble has a lot to offer in prison and can teach other prisoners a trade. She also said that Trimble has already made a difference in one prisoner's life by bringing him to Christ.

{¶ 294} Aubrey Bryce testified that he hired Trimble to make repairs on rental property in December 2003. Trimble charged a decent wage and performed quality work. Bryce never saw Trimble get angry during the 20 or 30 hours that he spent with him. He also never suspected that Trimble was using alcohol or drugs or suffered from any mental problems.

{¶ 295} Randall Cundiff, a realtor and property manager, testified that he hired Trimble in October 2003 to perform carpentry, plumbing, and other home repairs. Trimble was always reliable and performed outstanding work. Cundiff never suspected that Trimble was using alcohol or drugs or suffered from any mental problems.

{¶ 296} Mark Brazle, the pastor at Trimble's church, testified that he met Trimble in the summer of 2003. Trimble became a member of the church and

regularly attended Sunday services with Renee and Dakota. Trimble helped some elderly church members by voluntarily performing handyman work for them. Some church members complained that they could smell alcohol on Trimble, but Brazle never talked to him about alcohol. Brazle has often visited Trimble since he has been in jail. Trimble expressed his strong sense of remorse and described his feelings "as living hell because of his sorrow for what has happened."

{¶ 297} On June 25, 2004, Dr. Julie Vesco, a physician, treated Trimble for a disoriented mental state in the emergency room at Akron's Robinson Memorial Hospital. Trimble advised Dr. Vesco that he drinks five or six beers a night but denied any past or present drug use. However, a toxicology screen was completed, which was positive for the presence of amphetamines and benzodiazepines (tranquilizers).

{¶ 298} During Trimble's treatment, two CAT scans of his head were ordered. Trimble became agitated and refused to undergo the second CAT scan. Police and protective-services personnel were required to restrain Trimble, and he was sedated. However, Trimble remained agitated, and he was medicated, intubated, and placed on a ventilator before the second CAT scan could be completed.

{¶ 299} Martin Thomas, who is certified to test hair, testified that he collected samples of Trimble's head and body hair on April 15, 2005, and couriered them for testing to Omega Labs.

{¶ 300} Lauren Vinsick, the laboratory manager at Omega Labs, tested Trimble's hair samples for the presence of drugs. Vinsick testified that the sample of Trimble's body hair tested negative. However, testing of the sample of Trimble's head hair was positive for the presence of methamphetamines. Vinsick testified that the level of methamphetamines reported was 12.2 nanograms per ten milligrams of hair, which showed that "there was some type of consistent use" of

the drug. Testing also showed that methamphetamines had been in Trimble's system for at least 60 days.

{¶ 301} Dr. Lee Blum, a toxicologist, conducted tests on the shirt Trimble was wearing on the night of the murders for the presence of methamphetamines or other drugs. Blum testified that DNA testing confirmed that the bloodstains on the shirt were Trimble's. Tests on the bloodstained areas detected methamphetamine and amphetamine. Testing of an unstained area of the shirt also detected methamphetamines. Blum testified that methamphetamines found on this part of the shirt may have been deposited from perspiration or residue that had settled on the shirt after methamphetamines had been smoked. Testing of the shirt also resulted in presumptive findings for the presence of opiates, cocaine, and cannabinoids.

{¶ 302} David Parnell, a motivational and methamphetamine-education speaker, is a former methamphetamine addict who testified about the dangers of methamphetamine use. Parnell testified that a person using methamphetamines becomes extremely paranoid. He also testified that methamphetamine use can cause a person who was never violent to become violent.

{¶ 303} Dr. Robert Smith, a clinical psychologist who specializes in chemical dependencies, conducted a psychological evaluation of Trimble. Smith testified that Trimble began using substances at the age of 13. By the age of 16, he was using alcohol and marijuana several times a week. By the age of 22, Trimble was using methamphetamines, marijuana, and alcohol on a regular basis. As his methamphetamine addiction increased, Trimble began using prescription sedatives like Ativan, Valium, Librium, and Xanax, and pain-killers like Vicodin. Trimble's use of these drugs over time led to his dependence on them.

{¶ 304} Smith testified about Trimble's drug and alcohol use leading up to the murders on January 21. Trimble told Smith that he had used methamphetamines from January 17 until his arrest on January 21. He also

claimed that he had had no sleep during that time. The night before committing the offenses, Trimble had used a half gram of methamphetamines and had remained awake all night cleaning his guns and wandering in the woods. At 1:00 p.m. on the day of the murders, Trimble snorted a half gram of methamphetamine. Later that afternoon, he drank a 12-pack of beer and took two sedatives and two painkillers. During that evening, Trimble stated that he had snorted one to two more grams of methamphetamine and had drunk about six more beers.

{¶ 305} Smith did not believe that Trimble was insane at the time of the murders. However, Smith testified that Trimble was suffering from several psychological conditions then. These included a bipolar II disorder, alcohol and methamphetamine dependence, and abuse of Ativan and Vicodin. Smith believed that Trimble had been "acutely intoxicated at the time of the offense by each of these substances; that he had ingested them just prior to the offense; and that these substances and his bipolar II disorder contributed to his commission of the offense; and that it diminished his ability to conform his conduct to the requirements of the law."

{¶ 306} Dr. Jeffrey Smalldon, a clinical psychologist, testified that he evaluated and conducted psychological testing of Trimble. Smalldon described Trimble as an "extremely rigid" person. Trimble had told Smalldon that his father was "[v]ery strict, often harsh," and his father never spent a lot of time with him when he was young. Yet Trimble had been "devastated" when his father suddenly died in 1993. Trimble has never had a close relationship with his brother and described him as being "much like his father — rigid, critical, [and] emotionally withholding." On the other hand, Trimble stated that he has been "very close" to his mother, and "she did the best she could to buffer him * * * from his father's sternness and punitive attitude * * * ." Based on his interviews with Trimble and other family members, Smalldon found that Trimble was

56

subjected to "very harsh parental discipline and particularly his father engaged in a great deal of mental and emotional maltreatment when he was a young child."

{¶ 307} Trimble graduated from high school with a 2.49 grade point average and ranked 129 out of 240 in his graduating class. He later completed 15 hours of course work at the University of Akron but did not do well. Trimble then joined the Air Force, where he spent the next four years.

{¶ 308} Trimble said that before entering the Air Force, he was drinking heavily and using marijuana, Quaaludes, Seconal, LSD, peyote mushrooms, and other types of hallucinogenic drugs. Trimble indicated that he "drank very heavily" and "used marijuana heavily" while he was in the Air Force. Later, Trimble began using methamphetamines. Trimble stated that he used alcohol and drugs with his two wives and Renee. Trimble stated that their alcohol and drug use fueled the physical conflict that occurred during these relationships.

{¶ 309} Trimble has a "survivalist sort of orientation" that is related to his religious beliefs. Trimble stated that he believed in the coming rapture, when a certain group of believers will ascend into heaven, and others will remain on earth and participate in a war with Satan. As the year 2000 approached, Trimble stockpiled meals ready to eat ("MREs"), camouflage clothing, gas masks, and $2,000 in silver coins in anticipation that the rapture would occur at the start of the new millennium. Trimble also believed in the need to collect guns because of the major showdown that would occur.

{¶ 310} Over the years, Trimble has been treated with antidepressants and Depakote, which is frequently used to treat bipolar disorders. However, Trimble's medical records show little evidence that he was treated for his drug abuse, perhaps because Trimble failed to be open with his doctors about it.

{¶ 311} Smalldon also talked to Trimble about his relationship with Renee. Trimble stated, "I loved Renee. We had a lot of problems and I was a big

part of them." He also said, "I probably was as close to Dakota as I've ever been to anyone in my life."

{¶ 312} In discussing the murders, Trimble said that he had had almost no sleep for three or four days leading up to the shootings. Trimble also stated that he had been using methamphetamines, drinking beer, and taking other drugs beforehand. On the day of the murders, Trimble remembered eating dinner in the living room and being in the basement with Dakota. However, Trimble insisted that he had no further memory of anything that happened at his home. Nevertheless, Trimble never denied responsibility for killing Renee and Dakota. Trimble said, "I'm responsible, I know I did it. I know I wasn't insane. I think the meth had something to do with the fact I was capable of doing what I did that night but I don't want anyone trying to blame it on the meth, I'm responsible." However, Trimble insisted that he never intended to kill Positano. Trimble said that he shot Positano after a SWAT officer entered the house, and he dropped the pistol he was holding, and it went off.

{¶ 313} Smalldon administered a number of tests to Trimble and reviewed test results administered during previous treatments. IQ testing showed that Trimble has a verbal IQ of 113, a performance or nonverbal perceptual motor IQ of 98, and a full-scale IQ of 107. The results of two personality inventories produced a profile of someone who is "angry, quite egocentric, rigid, thin skinned, [and] quick to perceive [himself] as being wronged in some way." These results suggested issues related to substance abuse. However, the results did not suggest psychosis or psychotic illness. Neuropsychological testing showed that Trimble had not suffered a significant head injury that might have caused a problem with his impulse control, judgment, and self-regulation.

{¶ 314} Smalldon also reviewed reports from other psychologists, psychiatrists, and a neurologist who had treated Trimble. Between 1996 and 2001, Trimble was treated for recurring headaches. In 2001, Trimble was treated

58

at Rusk State Hospital in Texas, where he was diagnosed with a bipolar disorder. Between August 2003 and June 2004, Trimble was treated for alcohol dependence. During this period, three psychiatrists diagnosed Trimble with a bipolar disorder. In August 2005, Dr. Phillip Resnick, the state's expert, also diagnosed Trimble with a bipolar disorder. Smalldon also testified that three experts who had evaluated Trimble concluded that Trimble was "acutely intoxicated" from drugs and alcohol on the night of the murders.

{¶ 315} Smalldon diagnosed Trimble with "bipolar disorder, not otherwise specified (probable)." Smalldon also made five diagnoses related to Trimble's substance abuse: (1) methamphetamine dependence with physiological dependence but currently in a controlled environment, (2) alcohol dependence with physiological dependence but currently in a controlled environment, (3) cannabis dependence in remission, (4) anxiolytic abuse that refers to abuse of minor tranquilizers, and (5) opioid abuse that refers to abuse of painkillers. He also diagnosed Trimble with a "substance-induced persisting amnestic disorder" for his memory loss. Additionally, Smalldon diagnosed Trimble with narcissistic, paranoid, and antisocial personality traits. Smalldon testified that his diagnoses are virtually the same as the diagnoses of Resnick and Smith, who also examined Trimble.

{¶ 316} Smalldon does not believe that Trimble committed these offenses solely because he was intoxicated. However, Smalldon does believe that Trimble's intoxication had a "great deal to do that evening with his lack of ability to control his impulses and regulate his behavior."

{¶ 317} Trimble gave an unsworn statement on his own behalf. Trimble told "the families of Renee and Dakota and * * * Positano how truly sorry" he was. He added, "I wish I could change things. I would give anything to bring back Renee, Dakota or * * * Positano, but I know that can't happen. I have lived

with the fact that I killed them. That's all I think of from the time I wake up in the morning until the time I go to bed at night."

{¶ 318} Trimble also said, "Everything I had in my life has been sacrificed by me because I couldn't live my life without drugs. I am sorry I ever started drinking or doing drugs. I'm sorry I became a drug addict. I regret that I didn't have the strength and the courage to face life and the demons in my life without drugs. When I started smoking pot and drinking at age 13 I never imagined that I would have a drug problem. * * * When I was 20 a friend introduced me to meth and I thought I had found a perfect drug — I felt good and strong, almost invincible. I also liked to work and now I could work as much as I wanted and fast. My bosses loved me and I loved the feeling."

{¶ 319} In addition, Trimble said, "I tried to control my drugs, I tried to stop doing meth as much but I found out I just couldn't do it. By the time I moved back to Ohio my favorite drug, meth, * * * was cheap and easy to get so I started using meth three to four times a week. I had a routine. I would do meth two or three days, then crash a day or two, and then I would start right back to using meth again."

{¶ 320} As for the offenses, Trimble said, "I wish I knew all that happened that night and I'm sorry I can't explain it to you or the families. * * * And what I do remember is what I told Sheriff Kaley and all the doctors so far."

{¶ 321} Finally, Trimble said, "I have to look at my hands every day and know that with these hands I did such terrible deeds. I ask God constantly why did He allow me to do this, why didn't He just strike me down and kill me before this happened? Perhaps someday I'll know the answer. * * * And I'm hoping that until this time I can help others to take a different road than the road I chose."

**Sentence evaluation**

{¶ 322} We find nothing in the nature and circumstances of the offense to be mitigating. On January 21, 2005, Trimble murdered his girlfriend and her

seven-year-old son at their home and then fled into the woods. Shortly thereafter, Trimble broke into Sarah Positano's residence and took her hostage. Trimble then shot Positano in the neck and killed her. These facts establish a horrific crime without any mitigating features.

{¶ 323} Trimble's character offers nothing in mitigation. His history and background also provide little mitigating value. Trimble was raised by a loving mother and a father who was described as a strict disciplinarian. He was an average student and graduated from high school. Trimble abused drugs and alcohol early in life and used them while he was in high school and the Air Force. Trimble's drug and alcohol abuse also contributed to the break-up of his two marriages and his combative relationship with Renee.

{¶ 324} We find that the statutory mitigating factors are generally inapplicable, including R.C. 2929.04(B)(1) (victim inducement); (B)(2) (duress, coercion, or strong provocation); (B)(4) (youth of the offender; i.e., Trimble was 44 years old at the time of the offenses); (B)(5) (lack of a significant criminal record); and (B)(6) (not principal offender).

{¶ 325} We find that Trimble's mental deficiencies qualify as an R.C. 2929.04(B)(3) factor. The R.C. 2929.04(B)(3) mitigating factor applies when "at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of the offender's conduct or to conform the offender's conduct to the requirements of the law." Dr. Smith opined that because of Trimble's bipolar disorder and his use of alcohol, methamphetamines, and other drugs, Trimble had a diminished capacity to conform his conduct to the requirements of the law. However, Dr. Smalldon made similar findings regarding Trimble's bipolar disorder and drug and alcohol abuse, but made no findings that he suffered a diminished capacity as a result. Consequently, we find that the (B)(3) mitigating factor applies but give it modest weight.

{¶ 326} Trimble's diagnosed bipolar personality disorder and his drug and alcohol abuse undoubtedly played a role in his crimes and are entitled to weight under the catchall provision of R.C. 2929.04(B)(7). On the other hand, there is no evidence that Trimble is mentally retarded or mentally deficient. Trimble's full-scale IQ of 107 shows that he is "slightly above midpoint of the average range" of intelligence.

{¶ 327} We also give weight to other mitigating evidence under R.C. 2929.04(B)(7) (other relevant factors). This evidence includes testimony that he is a good and dependable worker and that he served four years in the Air Force. Trimble's assistance to elderly members of his church and the support that Trimble shares with his mother are also entitled to weight. Finally, Trimble's apologies and expressions of remorse during his unsworn statement are entitled to weight. See *State v. Hughbanks*, 99 Ohio St.3d 365, 2003-Ohio-4121, 792 N.E.2d 1081, ¶ 143. The evidence does not suggest any other (B)(7) mitigating factors.

{¶ 328} Upon independent weighing, we find that the aggravating circumstance or circumstances as to each count outweigh the mitigating factors beyond a reasonable doubt. As to Count 13, Trimble's murder of Renee occurred during a course of conduct involving the murder of two or more people. This constitutes a grave aggravating circumstance. As to Count 14, the two aggravating circumstances attached to Dakota's murder are extremely serious. In particular, the R.C. 2929.04(A)(9) child-murder specification is entitled to great weight because it involves the murder of a young and vulnerable victim. Finally, as to Count 15, the three aggravating circumstances attached to Positano's murder constitute grave circumstances. Trimble's murder of a young college student after kidnapping her and taking her hostage is a particularly egregious circumstance. In contrast, we find that as to each of these counts, Trimble's mitigating evidence has little significance. Therefore, we find that the death sentence in this case is appropriate.

{¶ 329} Finally, we find that the death penalty is proportionate to death sentences approved in other cases. As for all three murder counts, we have previously upheld the death sentences for a course of conduct under R.C. 2929.04(A)(5). *State v. Vrabel*, 99 Ohio St.3d 184, 2003-Ohio-3193, 790 N.E.2d 303, ¶ 80-81; *State v. Braden*, 98 Ohio St.3d 354, 2003-Ohio-1325, 785 N.E.2d 439, ¶ 162-163; *State v. Clemons*, 82 Ohio St.3d at 456-457, 696 N.E.2d 1009.

{¶ 330} Additionally, we have upheld the death penalty for other child murders under R.C. 2929.04(A)(9). *State v. Fitzpatrick*, 102 Ohio St.3d 321, 2004-Ohio-3167, 810 N.E.2d 927, ¶ 119 (12-year-old victim); *State v. Lynch*, 98 Ohio St.3d 514, 2003-Ohio-2284, 787 N.E.2d 1185, ¶ 196 (six-year-old victim); *State v. Smith*, 97 Ohio St.3d 367, 2002-Ohio-6659, 780 N.E.2d 221, ¶ 79 (six-month-old victim).

{¶ 331} We have also upheld the death penalty for aggravated murder during an aggravated burglary and aggravated murder during a kidnapping under R.C. 2929.04(A)(7). *State v. Hill* (1996), 75 Ohio St.3d 195, 214, 661 N.E.2d 1068; *State v. Waddy* (1992), 63 Ohio St.3d 424, 453, 588 N.E.2d 819.

Judgment affirmed.

LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

PFEIFER, J., concurs separately.

_____

**PFEIFER, J., concurring.**

{¶ 332} At trial, the prosecutor presented and the trial court allowed unnecessary evidence, including 19 firearms that were not involved in the murders and dozens of pictures that were repetitive. I am troubled by the inclusion of evidence that was so rife with potential prejudice. See Evid.R. 401 and 403. Although whether the jury was prejudiced by this evidence is a close

call, I reach the same conclusion as the majority and therefore concur in affirming the sentence of death.

_____

Victor V. Vigluicci, Portage County Prosecuting Attorney, and Pamela J. Holder, Assistant Prosecuting Attorney, for appellee.

Nathan A. Ray and Lawrence J. Whitney, for appellant.

_____